value, this court affirms by summary order under Rule 30.25(b).

Affirmed. Rule 30.25(b).

**STATE of Missouri, Respondent,**

v.

**Ruben GARCIA, Jr., Appellant.**

**No. WD 62649.**

Missouri Court of Appeals,
Western District.

July 6, 2004.

**STATE of Missouri, Respondent,**

v.

**Terrence L. HAWKINS, Appellant.**

**No. WD 61979.**

Missouri Court of Appeals,
Western District.

July 6, 2004.

John M. Schilmoeller, Kansas City, MO, for appellant.

Deborah Daniels, Jefferson City, MO, for respondent.

Before ULRICH, P.J., LOWENSTEIN and EDWIN H. SMITH, JJ.

*ORDER*

Rosemary E. Percival, Kansas City, MO, for appellant.

Andrea Mazza Follett, Assistant Attorney General, Jefferson City, MO, for respondent.

Before NEWTON, P.J., ULRICH and BRECKENRIDGE, JJ.

PATRICIA BRECKENRIDGE, Judge.

Terrence L. Hawkins appeals his conviction for one count of the class D felony of unlawful use of a weapon, under section 571.030, RSMo 2000,[1] and one count of the class A misdemeanor of possession of a controlled substance, marijuana, under section 195.202. On appeal, Mr. Hawkins claims that the court erred in overruling his motion to suppress evidence because the initial stop, the pat-down search of his person, and the subsequent search of the car in which he was a passenger were illegal, and any evidence obtained was inadmissible as fruit of the poisonous tree. Mr. Hawkins also claims that the State did not establish that he knowingly carried a loaded gun on or about his person and, therefore, failed to prove that he committed the crime of unlawful use of a weapon. Because this court finds that the stop and searches were lawful, and the evidence was sufficient to support Mr. Hawkins' conviction for unlawful use of a weapon, the judgment is affirmed.

**Factual and Procedural Background**

In the early morning hours of April 2, 2002, Lieutenant Michael Smith of the

---

1. All statutory references are to the Revised Statutes of Missouri 2000.

Jefferson City Police Department was conducting surveillance of 10 and 12 Jackson Street, which are two buildings known as the Dulle and Hamilton Towers. In his twelve-year tenure with the police department, Lieutenant Smith was familiar with this area because the department had received numerous calls to the area concerning "[e]verything from narcotics transactions to trespassing disturbances." Additionally, in the six years he was assigned to the community services unit, he spent a lot of his time in this neighborhood. According to Lieutenant Smith, the neighborhood was "a common area for [drug] transactions to take place." Lieutenant Smith had had recent contact with members of the Housing Authority Staff, who "believed that they had a [drug trafficking] problem there."

At around 12:50 A.M., Lieutenant Smith was watching the activity at the Dulle and Hamilton Towers through binoculars when he saw a red Chevrolet Corvette pull up in front of the Towers. There were two men inside the Corvette. As the Corvette pulled up, a man exited one of the buildings and approached the car. The passenger got out of the car. Lieutenant Smith recognized the passenger to be Mr. Hawkins. Lieutenant Smith knew Mr. Hawkins from Mr. Hawkins' prior arrest, during which Mr. Hawkins was found to be in possession of a stolen car, $1300 in small bills, and several grams of crack cocaine.

After Mr. Hawkins got out of the Corvette, Lieutenant Smith saw Mr. Hawkins and the man who had come out of the building do a "hurried action." Lieutenant Smith believed the "hurried action" was a hand-to-hand transaction, during which the two men passed something between them. According to Lieutenant Smith, it looked like more than just a handshake. Instead, the movement of their hands indicated "that there was something that had been exchanged between the two." Lieutenant Smith testified that this action took less than thirty seconds.

Believing it likely that a narcotics transaction had taken place, Lieutenant Smith exited the lot and pulled up behind the Corvette. Lieutenant Smith's patrol car was unmarked, and he did not activate the dashboard lights or siren. As Lieutenant Smith's car approached the rear of the Corvette, the unidentified man hurriedly left the area and went back into the building. Mr. Hawkins stepped back into the front passenger seat of the Corvette. As Lieutenant Smith started to get out of his car, the driver of the Corvette drove away.

Lieutenant Smith got back into his car and followed the Corvette on Jackson Street for half a block before activating his dashboard lights. The Corvette stopped. Lieutenant Smith ran a check on the license plate and found that the car was registered to General Davis. Lieutenant Smith also radioed for backup. As he was waiting for backup to arrive, Lieutenant Smith got out, stood by his car, and watched the men in the Corvette.

In less than thirty seconds, Officer Steve Dappen arrived in a patrol car and parked behind Lieutenant Smith. Lieutenant Smith told Officer Dappen he had seen a hand-to-hand drug transaction between Mr. Hawkins and another man. The two officers began walking toward the Corvette. As Lieutenant Smith approached the driver's side, he watched both men through the Corvette's rear window. Lieutenant Smith saw Mr. Hawkins, still sitting in the front passenger seat, make "some form of furtive movements." Specifically, Lieutenant Smith saw Mr. Hawkins' shoulders move forward, and Mr. Hawkins "appeared to lean forward as if he was placing something on the floor or under the seat." Concerned, Lieutenant Smith told Officer Dappen to keep a close

eye on Mr. Hawkins, because he had seen Mr. Hawkins bend over and put something under the seat.

Lieutenant Smith asked the driver for his license, identified him as Mr. Davis, and then asked him to step to the rear of the car where they could talk. During his conversation with Mr. Davis, Lieutenant Smith obtained Mr. Davis' permission to search the car. Meanwhile, Officer Dappen, who did not move any closer to the passenger side than the rear bumper, shone his flashlight on Mr. Hawkins. Officer Dappen was unable to see Mr. Hawkins' hands, but he believed Mr. Hawkins was fidgeting with something in his lap. When Officer Dappen asked to see Mr. Hawkins' hands, he raised them. Once Mr. Hawkins raised his hands, Officer Dappen saw that he was holding a cell phone.

Officer Dappen asked for Mr. Hawkins' identification, and Mr. Hawkins complied. Officer Dappen then explained to Mr. Hawkins that Lieutenant Smith had stopped him for suspicious activity. He also asked Mr. Hawkins if he had been at the Towers, gotten out of the Corvette, and made a drug deal, to which Mr. Hawkins said, "No." Officer Dappen asked Mr. Hawkins to step out of the car.

Because of Mr. Hawkins' actions when the officers first approached the car, and because of the transaction Lieutenant Smith had witnessed, Officer Dappen was concerned for their safety and asked Mr. Hawkins if he would consent to a pat-down search for weapons. Mr. Hawkins consented. During the pat-down search, Officer Dappen patted the left front pocket of Mr. Hawkins' shirt. As his hand hit the pocket, Officer Dappen "immediately" felt a paper bag and a leafy substance inside the paper bag. Officer Dappen did not manipulate the substance or push against the shirt pocket. In his training and experience as a police officer, Officer Dappen had found paper bags that contained marijuana on people or in vehicles. Based upon this training and experience, Officer Dappen believed that the leafy substance in the paper bag was marijuana. Upon feeling the bag, Officer Dappen asked Mr. Hawkins what was in his pocket. Mr. Hawkins told him it was a paper bag. When Officer Dappen asked him why he had a paper bag in his pocket, whose bag it was, and what was in the bag, Mr. Hawkins did not reply.

While Officer Dappen held Mr. Hawkins, Officer Dappen asked Lieutenant Smith to remove the paper bag from Mr. Hawkins' pocket. Lieutenant Smith pulled the paper bag out from Mr. Hawkins' pocket. As Lieutenant Smith removed the paper bag, Officer Dappen saw a brown and green leafy substance fall from a hole in the bottom of the paper bag. From their training and experience, Lieutenant Smith believed the material to be a controlled substance, and Officer Dappen thought it was, specifically, marijuana. Officer Dappen arrested Mr. Hawkins for possession of a controlled substance, handcuffed him, and read him his Miranda rights.

After Mr. Hawkins was arrested, Lieutenant Smith informed Mr. Davis that his passenger had been arrested for possession of a controlled substance. Lieutenant Smith then began searching the car starting with the passenger side. Lieutenant Smith knelt on the curb and looked into the passenger side of the car. As he was looking into the car from that position, he saw part of a small handgun on the floor, sticking out from under the front edge of the front passenger seat. Lieutenant Smith retrieved the gun, a Sterling .22, and checked it for safety purposes. As he was checking the gun, he found a magazine loaded with six rounds of ammunition.

Mr. Hawkins was taken into custody, and the gun and the marijuana were taken

to the Highway Patrol laboratory for testing. The gun, which was not registered, was found to function as designed by the manufacturer. Specifically, it was found to function as a semi-automatic firearm. Officer Dappen field-tested the substance in the bag and found it to be marijuana. Later, the Highway Patrol laboratory weighed and tested the substance and determined it was .24 gram of marijuana.

Mr. Hawkins was subsequently charged, as a prior and persistent offender, with one count of the class D felony of unlawful use of a weapon, under section 571.030; and one count of the class A misdemeanor of possession of a controlled substance, namely, marijuana, under section 195.202. Before trial, Mr. Hawkins filed a motion to suppress the gun, marijuana, and any testimony concerning this evidence on the basis that the stop and subsequent searches were unlawful. The motion was denied after a hearing.

Trial was held on August 13, 2002. Mr. Hawkins' defense focused primarily on the unlawful use of a weapon charge. Mr. Hawkins' main witness, Charles Key, testified that Mr. Hawkins had been staying with him and his son. According to Mr. Key, Mr. Hawkins had been home all day with him, lounging around and lying on the couch wearing pants but no shirt or shoes. At 12:30 A.M., an older man came to the door to see Mr. Hawkins. Mr. Hawkins put on a shirt and left with the man. Mr. Key testified that the whole time he was with Mr. Hawkins that day, he did not see a gun on Mr. Hawkins; nor did he see Mr. Hawkins place a gun in his pants or on his person. Mr. Key did not know if the older man who came to get Mr. Hawkins was carrying a gun, however; nor did he know if the older man handed Mr. Hawkins a gun after they left.

The jury found Mr. Hawkins guilty on both counts. The court denied Mr. Hawkins' motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The court found Mr. Hawkins to be a prior offender and sentenced him to three years in prison for unlawful use of a weapon, and one year in prison for possession of a controlled substance.[2] The sentences were to run concurrently. Mr. Hawkins appeals.

## Motion to Suppress

In his first two points, Mr. Hawkins claims the court erred in denying his motion to suppress the gun, the magazine found in the gun, the marijuana, any testimony concerning those items and the stop of the car, because all of this evidence was the fruit of an unlawful stop and unlawful searches. In particular, he claims that the officers did not have reasonable suspicion to stop the car; the pat-down search exceeded the scope of a lawful search for weapons; and any consent to search the car did not have sufficient independence from the illegal stop and pat-down search.

### a. No Affirmative Waiver of Appellate Review

■ Initially, the State argues that this court should decline to review Mr. Hawkins' claims of error concerning the motion to suppress because Mr. Hawkins affirmatively waived appellate review by stating "no objection" when the physical evidence obtained from the stop and searches was introduced during trial. It is true that "Missouri courts have consistently held that stating 'no objection' when evidence is introduced precludes direct appellate review of the admission." *State v. Baker*, 103 S.W.3d 711, 716 (Mo. banc 2003). In

---

**2.** Although the court found Mr. Hawkins to be a prior offender, the court did not state at sentencing or in its judgment that it sentenced him as a prior offender.

*Baker*, the Supreme Court carved out a narrow exception to this rule, however. The defense counsel in *Baker* filed a motion to suppress certain evidence; renewed his motion to suppress immediately before trial; and requested, during the prosecutor's opening statement, a continuing objection to the admission of the evidence. *Id.* at 715. The court granted the continuing objection. *Id.* Nevertheless, when the State offered the evidence for admission, defense counsel stated "no objection." *Id.*

On appeal, the State argued that defense counsel's statement of "no objection" precluded appellate review of the motion to suppress. *Id.* at 716. The Supreme Court noted the waiver principle and also noted the "firmly-established rule that counsel is obligated to make specific objections at trial." *Id.* The Court found, however, that "the concern underlying the rule" was not implicated in that case:

> [N]either the prosecutor nor the trial court misunderstood appellant's statement at trial, as evidenced by the fact that the trial court considered appellant's claim regarding the admission of the evidence when ruling on appellant's motion for new trial, and the prosecutor did not object to the inclusion of that claim in the motion.

*Id.* Thus, the Court interpreted defense counsel's statement of "no objection" as meaning that the appellant had "no objection other than the continuing objection." *Id.* at 716–17. Because "it was mutually understood that appellant did not intend to repudiate his prior objection," the Court stated that it would "likewise acknowledge its continued validity." *Id.* at 717.

In this case, Mr. Hawkins raised his objection to the admission of the evidence during his pre-trial motion to suppress, which was overruled. He objected twice during Lieutenant Smith's testimony, one time asserting that the stop was unlawful and the other time asserting that the pat-down search was unlawful. Mr. Hawkins objected again to the lawfulness of the pat-down search during Officer Dappen's testimony. When he objected that time, the trial court stated, "Same objection?" Defense counsel replied, "Yes," and started to explain the objection again before the court interrupted and overruled the objection.

After the State rested, the court denied Mr. Hawkins' motion for a directed verdict. Following the testimony of Mr. Hawkins' first witness, the prosecutor approached the bench and told the court, "Your Honor, I don't know if I have to reopen my case, but I did not move to enter my exhibits into evidence." Defense counsel then stated, "No objection." The court admitted the gun, magazine, and bag of marijuana into evidence. After the exhibits were admitted, defense counsel objected, but on the basis of chain of custody of the items. The court overruled the objection. In his motion for a JNOV or new trial, Mr. Hawkins again asserted his claim that admission of the evidence was erroneous on the basis of the illegal stop and searches. At the hearing on this motion, defense counsel stated, "I think what is discussed in the motion itself has been discussed before and is self-evident." He then reiterated his argument about the illegality of the stop. In response, the prosecutor stated, "I don't have anything to add that we haven't talked about before on the aspects of the Defendant's Motion for New Trial." The court then overruled the motion.

The State argues that this case is distinguishable from *Baker* because Mr. Hawkins never asked that his objection to the evidence on the basis of the alleged illegality of the stop and searches be a *continuing* objection. Despite his failure to specify the objection was a continuing one,

however, it is clear, as it was in *Baker*, that neither the prosecutor nor the trial court misunderstood defense counsel's statement of "no objection" at trial. *See id.* at 716. The prosecutor and the trial court could have reasonably interpreted defense counsel's statement of "no objection" to mean that he had no objection to the State introducing its exhibits at that time, rather than having to re-open its case to do so. Furthermore, the trial court considered Mr. Hawkins' claim in the motion for new trial. Not only did the prosecutor not object to the inclusion of the claim in the motion for new trial, but the prosecutor acknowledged that it was the same claim Mr. Hawkins had raised throughout the trial.

This case is similar to a case from this court, *State v. Stillman*, 938 S.W.2d 287, 290 (Mo.App.1997), which was cited with approval in *Baker*, 103 S.W.3d at 716–17. In *Stillman*, defense counsel made a written motion to suppress, an oral motion to suppress before opening statements, and renewed his objections during the trial testimony. 938 S.W.2d at 290. There is no indication in *Stillman* that defense counsel stated that his objections were continuing. Although defense counsel stated "no objection" when the physical evidence was introduced, this court found that "the trial court and opposing counsel understood that defendant's counsel did not intend to waive the carefully made record on the motion to suppress the evidence." *Id.* This court reasoned that "[t]o now rule a waiver of this point and a denial of review would be a hypertechnical application of the requirement of renewing the objection at every stage." *Id.*

Likewise, this court finds that waiver of Mr. Hawkins' points concerning the motion to suppress and denial of review would be a hypertechnical application of the rule, in light of his consistently raising the issue at every stage of the proceedings. The State and the court understood Mr. Hawkins was not waiving the issue. Therefore, this court will review the denial of the motion to suppress on its merits.

### b. Standard of Review

Appellate review of the denial of a motion to suppress is limited to a determination of whether there was substantial evidence to support the ruling. *State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc 1998). In making this determination, this court reviews both the suppression hearing record and the evidence presented at trial. *State v. Deck*, 994 S.W.2d 527, 534 (Mo. banc 1999).

This court views the evidence and any reasonable inferences from the evidence in the light most favorable to the trial court's ruling. *State v. Carter*, 955 S.W.2d 548, 560 (Mo. banc 1997). This court defers to the trial court's determination as to the credibility of witnesses. *Rousan*, 961 S.W.2d at 845. The ultimate issue of whether the Fourth Amendment was violated is a question of law, however, which this court reviews de novo. *State v. McFall*, 991 S.W.2d 671, 673 (Mo.App.1999). The United States Supreme Court has described, in detail, the duty of an appellate court in reviewing the legal and factual questions involved in Fourth Amendment cases:

> We therefore hold that as a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal. Having said this, we hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.
>
> A trial judge views the facts of a particular case in light of the distinctive

features and events of the community; likewise, a police officer views the facts through the lens of his police experience and expertise. The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference.

*Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996).

### c. Reasonable Suspicion Existed for Stop

■ Mr. Hawkins first argues that the initial stop of the Corvette was unlawful under the United States and Missouri Constitutions. The Fourth Amendment to the United States Constitution protects persons against unreasonable searches and seizures. Article I, section 15 of the Missouri Constitution affords the same protection and has been deemed to be coextensive with the Fourth Amendment. *State v. Rushing,* 935 S.W.2d 30, 34 (Mo. banc 1996). Decisions of the United States Supreme Court construing the Fourth Amendment are "strongly persuasive" in construing article I, section 15 of the Missouri Constitution. *Id.*

■ Under the principles outlined in *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968), a police officer may make an investigatory stop of a person, in the absence of probable cause, when the officer has a reasonable suspicion that the person is engaged in criminal activity. For such a stop to be permissible under the Fourth Amendment, it must be "based on reasonable suspicion supported by articulable facts that the person stopped is engaged in criminal activity." *Deck,* 994 S.W.2d at 534.

■ The principles of *Terry* have been applied to permit a police officer to briefly stop a moving automobile to investigate, if the officer has a reasonable suspicion that

its occupants are involved in criminal activity. *State v. Franklin,* 841 S.W.2d 639, 641 (Mo. banc 1992) (citing *United States v. Brignoni–Ponce,* 422 U.S. 873, 882, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975)). Whether "reasonable suspicion" exists depends on the totality of the circumstances. *Id.* at 644. A suspicion is reasonable when the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880. The standard is whether, prior to the seizure, the "detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002) (quoting *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)).

It is undisputed that Mr. Hawkins was seized, for Fourth Amendment purposes, when Lieutenant Smith stopped the Corvette in which he was a passenger. Looking at the facts available to Lieutenant Smith prior to the seizure, one of the facts was that Mr. Hawkins was in a high-crime area in which it was common for narcotics transactions to take place. Lieutenant Smith was aware of the criminal and drug activity in this area because, in his twelve years with the Jefferson City Police Department, the department had received numerous complaints about this area. Additionally, he was personally familiar with the criminal activity in this area because, in the six years he was assigned to the community services unit, he spent a lot of time in this neighborhood. Lieutenant Smith also had recent contact with members of the Housing Authority Staff, who believed "that they had a problem" with drug trafficking in that area.

■ Mr. Hawkins' presence in a high-crime neighborhood where drug deals

were known to take place is not, on its own, a sufficient basis for concluding that Mr. Hawkins was engaged in criminal conduct. *Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979). Nevertheless, "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000). Therefore, "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis." *Id.*

■ Another fact known to Lieutenant Smith at the moment of the seizure was that Mr. Hawkins had been arrested in the past and, during the last arrest that Lieutenant Smith could remember, Mr. Hawkins was in possession of a stolen car, $1300 in small bills, and several grams of crack cocaine. "[K]nowledge of a person's prior criminal involvement (to say nothing of a mere arrest) is alone insufficient to give rise to the requisite reasonable suspicion." *United States v. Sandoval*, 29 F.3d 537, 542 (10th Cir.1994). Knowledge of "recent relevant criminal conduct," however, "is a permissible component of the articulable suspicion required for a *Terry* stop." *United States v. Feliciano*, 45 F.3d 1070, 1074 (7th Cir.1995). Lieutenant Smith's knowledge of Mr. Hawkins' prior criminal activity, during which Mr. Hawkins was found in possession of drugs and a fairly large amount of cash, is a permissible factor to consider in determining whether articulable suspicion existed.

The final fact available to Lieutenant Smith was his having witnessed what he believed to be a hand-to-hand transaction between Mr. Hawkins and an unidentified man. Specifically, Lieutenant Smith saw the car in which Mr. Hawkins was riding pull up to the apartment buildings just as an unidentified man was exiting one of the buildings. Lieutenant Smith then saw Mr. Hawkins get out of the car and approach the unidentified man, and the two appeared to pass something hurriedly between their hands before walking away from each other. A hand-to-hand exchange between the defendant and another is a circumstance that, with others, will support a finding of reasonable suspicion. *See Davis v. State*, 351 Ark. 406, 94 S.W.3d 892, 898 (2003).

Thus, the circumstances known to Lieutenant Smith were that Mr. Hawkins was in a high-crime area known for narcotics transactions; Lieutenant Smith was familiar with Mr. Hawkins because Mr. Hawkins had been arrested in the past and, during the last arrest Lieutenant Smith could remember, Mr. Hawkins was found in possession of narcotics and a fairly large amount of cash; and Lieutenant Smith witnessed Mr. Hawkins hurriedly exchange something with an unidentified man. Mr. Hawkins discounts each of these circumstances, arguing that his being in a high-crime area and his possible prior drug arrest "mean nothing," and that the perceived hand-to-hand transaction was subject to numerous innocent explanations.

■ Rather than look at each circumstance individually, however, reviewing courts must consider the totality of the circumstances to determine "whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273, 122 S.Ct. at 750 (quoting *Cortez*, 449 U.S. at 417–18, 101 S.Ct. at 695). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* at

273, 122 S.Ct. at 750–51 (quoting *Cortez*, 449 U.S. at 418, 101 S.Ct. at 695). What might be considered "unremarkable" behavior in one particular location and context may be deemed "quite unusual" in another. *Id.* at 276, 122 S.Ct. at 752. A police officer is "entitled to make an assessment of the situation in light of his specialized training and familiarity with the customs of the area's inhabitants." *Id.* "To the extent that a totality of the circumstances approach may render appellate review less circumscribed by precedent than otherwise, it is the nature of the totality rule." *Id.*

 That these circumstances, individually, may not be proof of any illegal conduct and are consistent with innocent behavior does not establish a violation of the Fourth Amendment. *Wardlow,* 528 U.S. at 125, 120 S.Ct. at 677. As the United States Supreme Court noted in *Wardlow,* "[e]ven in *Terry,* the conduct justifying the stop was ambiguous and susceptible of an innocent explanation." *Id.* *Terry,* however, permits officers to detain persons "to resolve the ambiguity." *Id.* The Court acknowledged that "[i]n allowing such detentions, *Terry* accepts the risk that officers may stop innocent people." *Id.* at 126, 120 S.Ct. at 677. Such a risk is justifiable, however, because a *Terry* stop is a "minimal intrusion, simply allowing the officer to briefly investigate further. If the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way." *Id.*

Mr. Hawkins' hurried hand-to-hand exchange with the unidentified man may be susceptible to innocent explanation. When the exchange is considered with the other facts in this case, however, the totality of the circumstances before Lieutenant Smith were sufficient to form a particularized and objective basis warranting the minimal intrusion permitted under *Terry.* Lieu-

tenant Smith had reasonable suspicion to stop the car in which Mr. Hawkins was riding. Therefore, the stop did not violate the Fourth Amendment or article I, section 15 of the Missouri Constitution, and the trial court did not err in denying Mr. Hawkins' motion to suppress on this basis.

### d. Pat–Down Search Did Not Exceed Lawful Scope

 Mr. Hawkins next argues that, even if the stop was lawful, the evidence should still have been suppressed because the pat-down search conducted by Officer Dappen was unlawful. After a valid stop, *Terry* permits the police to "pat a suspect's outer clothing if they have a reasonable, particularized suspicion that the suspect is armed." *Rushing,* 935 S.W.2d at 32. Mr. Hawkins does not contend that the police did not have reasonable suspicion to initiate the pat-down search. Rather, Mr. Hawkins argues that the officers exceeded the lawful scope of the pat-down search, and Lieutenant Smith's removal of the paper bag of marijuana from Mr. Hawkins' shirt pocket was an unlawful seizure.

 The purpose of the limited pat-down search permitted under *Terry* " 'is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence[.]' " *Id.* (quoting *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972)). Nevertheless, in *Minnesota v. Dickerson,* 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993), the United States Supreme Court adopted the "plain-feel" exception to the warrant requirement for the seizure of non-weapons evidence during a *Terry* pat-down search. *Rushing,* 935 S.W.2d at 32. The Missouri Supreme Court summarized the holding of *Dickerson* and the scope of the "plain-feel" exception:

In *Minnesota v. Dickerson,* 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334

(1993), the Supreme Court approved the "plain-feel" exception to the warrant requirement. The court reasoned that if "a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified...." *Id.* at 375–76, 113 S.Ct. at 2137. The court concluded that the search in *Dickerson* exceeded the scope of *Terry* because the incriminating character of the object felt was not immediately apparent to the officer. *Id.* at 379, 113 S.Ct. at 2139. The court emphasized that "the officer determined that the lump was contraband only after 'squeezing, sliding and otherwise manipulating the contents of the defendant's pocket'—a pocket which the officer already knew contained no weapon." *Id.* at 378, 113 S.Ct. at 2138 (quoting *State v. Dickerson,* 481 N.W.2d 840, 844 (Minn.1992)).

*Rushing,* 935 S.W.2d at 32. Applying *Dickerson,* the Missouri Supreme Court held that "to justify a seizure under the plain-feel doctrine, the officer must have probable cause to believe that the item felt is contraband." *Id.* at 33. "Probable cause exists when the facts and circumstances within the knowledge of the seizing officer are sufficient to warrant a person of reasonable caution to believe that the item may be contraband or other evidence of a crime." *Id.* "Relevant to this determination is the officer's factual knowledge, based on his law enforcement experience." *Id.*

Mr. Hawkins argues that probable cause did not exist in this case because the "contraband nature" of the marijuana in the bag was not immediately apparent, in that the bag was folded over several times and

there was only a tiny amount of marijuana—.24 gram—in the bag. Mr. Hawkins contends that the only way Officer Dappen could have known that the substance in the bag was marijuana was by manipulating it, which was not permissible because he knew the pocket contained a paper bag and not a weapon. Mr. Hawkins also argues that Officer Dappen was so unsure about the identity of the object in Mr. Hawkins' pocket that he asked Lieutenant Smith to feel it and give his opinion about what it was.

Mr. Hawkins' argument ignores this court's standard of review. In reviewing the ruling on a motion to suppress, this court must view the evidence, and all reasonable inferences therefrom, in the light most favorable to the trial court's ruling. *Carter,* 955 S.W.2d at 560. The evidence favorable to the trial court's ruling indicates that there was more than .24 gram of marijuana in the paper bag when Officer Dappen initially touched the bag and recognized the substance in the bag as marijuana. Officer Dappen testified that as Lieutenant Smith was removing the bag from Mr. Hawkins' pocket, Officer Dappen saw marijuana fall from the bottom of the bag. A reasonable inference is that .24 gram of marijuana was merely all that *remained* in the paper bag after the marijuana had spilled out of the bag and after Officer Dappen field-tested the marijuana.

Furthermore, Officer Dappen specifically testified that he did not manipulate the substance or push against Mr. Hawkins' shirt pocket in an attempt to identify the substance in the bag. Rather, he testified that when his hand first hit Mr. Hawkins' shirt pocket, he "immediately" felt a paper bag and a leafy substance inside the paper bag. Based upon his training and experience, he believed that the leafy substance in the bag was marijuana. Moreover,

while it is true that Lieutenant Smith testified that Officer Dappen asked him to feel the bag before it was removed from Mr. Hawkins' pocket, Officer Dappen testified at both the suppression hearing and at trial that he asked Lieutenant Smith only to remove or pull the paper bag out of Mr. Hawkins' pocket. "Conflicts in the evidence and the credibility of witnesses are matters for the trial court to resolve." *State v. Nunnery,* 129 S.W.3d 13, 18 (Mo. App.2004). The trial court was free to believe Officer Dappen's testimony, and this court defers to its decision to do so. *See McFall,* 991 S.W.2d at 675. The pat-down search did not exceed its lawful scope.

Officer Dappen's feel of the marijuana in the bag, his knowledge of the hand-to-hand exchange observed by Lieutenant Smith, the reputation of the area as a narcotics trafficking area, and Officer Dappen's knowledge of commonly-used drug containers are factors that support a finding that Officer Dappen had probable cause to conclude that Mr. Hawkins was carrying marijuana. *See Rushing,* 935 S.W.2d at 33. Under the totality of the circumstances, the trial court did not err in finding that Officer Dappen had probable cause to believe that the bag in Mr. Hawkins' pocket contained marijuana before Officer Dappen asked Lieutenant Smith to remove the bag from the pocket. *See id.* Therefore, the seizure of the marijuana was lawful. The trial court did not err in denying Mr. Hawkins' motion to suppress on this basis.

#### d. Car Search Lawful

■ Mr. Hawkins further argues that the court should have granted the motion to suppress because the search of the car, during which the gun and the magazine in the gun were discovered, was unlawful. Specifically, he argues that Mr. Davis' consent to search the car did not have sufficient independence from the stop and pat-

down search. He asserts that because the stop and pat-down search were unlawful, they tainted Mr. Davis' consent to search his car.

Contrary to Mr. Hawkins' claim, the evidence, in the light most favorable to the verdict, is that Mr. Davis gave his consent after the stop but before the pat-down search. Regardless, this court has found that both the stop and pat-down search were lawful, so neither could have tainted Mr. Davis' consent. As Mr. Hawkins raises no other claim of error regarding the search of the car, this court finds that the trial court did not err in denying the motion to suppress on this basis.

Mr. Hawkins' first and second points are denied.

### Sufficient Evidence Supports Unlawful Use of a Weapon Conviction

■ In his final point, Mr. Hawkins claims that the evidence was insufficient to support his conviction for unlawful use of a weapon. This court's review of a challenge to the sufficiency of the evidence to support a criminal conviction is limited to determining whether sufficient evidence was presented " 'from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt.' " *State v. Grim,* 854 S.W.2d 403, 405 (Mo. banc 1993) (citation omitted). The evidence and all reasonable inferences drawn therefrom are viewed in the light most favorable to the jury's verdict. *Id.* All contrary inferences are disregarded. *Id.* Reasonable inferences may be drawn from direct and circumstantial evidence. *See id.* at 412–13. The jury "may believe or disbelieve all, part, or none of the testimony of any witness." *State v. Baker,* 40 S.W.3d 392, 396 (Mo.App.2001).

■ Mr. Hawkins was convicted of unlawful use of a weapon in violation of section 571.030.1(1). Section 571.030.1(1) provides that "[a] person commits the crime of

unlawful use of weapons if he or she knowingly: (1) Carries concealed upon or about his or her person a knife, a firearm, a blackjack or any other weapon readily capable of lethal use[.]" The Supreme Court has held that the essential elements of the offense of unlawful use of weapons "are the knowing concealment and accessibility of a functional lethal weapon." *State v. Purlee*, 839 S.W.2d 584, 590 (Mo. banc 1992). A weapon being carried in a vehicle is concealed under the statute if it meets three criteria:

> [T]he weapon is (1) not readily and practically visible to a person approaching the vehicle under ordinary circumstances and (2) within easy reach of any of the vehicle's occupants and (3) if the weapon is a firearm, it is operational and loaded, or if not loaded, ammunition is within easy reach of any of the vehicle's occupants.

*Id.* at 591.

The gun in this case was found under the passenger seat in which Mr. Hawkins was sitting. Lieutenant Smith and Officer Dappen did not see the gun when they first approached Mr. Davis' car. When Lieutenant Smith knelt on the curb to search the car, however, he was able to see the gun sticking out from under the front edge of the seat. The gun was loaded with six rounds of ammunition and was found to function as a semi-automatic firearm. This evidence indicates that the gun was not readily and practically visible to a person approaching the car; the gun was within Mr. Hawkins' easy reach and convenient control, *see State v. Patterson*, 624 S.W.2d 11, 13 (Mo.1981); and the gun was operational and loaded. Thus, the jury could have reasonably found that the gun was concealed under section 571.030.1(1).

Mr. Hawkins argues that the evidence fails to show that he *knew* the gun was concealed under the passenger seat of Mr. Davis' car.[3] He notes that it was nighttime when he got into the car, he had not been in the car very long before the stop, and the person he had been with before getting into the car, Mr. Key, testified that he did not see Mr. Hawkins carrying a gun. Essentially, he argues that there was nothing to connect him to the gun other than that he happened to be sitting in the seat under which it was found.

The jury was free to disbelieve Mr. Key. *Baker*, 40 S.W.3d at 396. Moreover, Lieutenant Smith testified that, after the stop, he saw Mr. Hawkins' shoulders move forward. According to Lieutenant Smith, Mr. Hawkins "appeared to lean forward as if he was placing something on the floor or under the seat." Lieutenant Smith communicated this to Officer Dappen. As they were approaching Mr. Davis' car, Lieutenant Smith warned Officer Dappen to be careful because he had seen Mr. Hawkins bend over and put something under the seat. From this evidence, the jury could have reasonably inferred that Mr. Hawkins knowingly concealed the gun under the seat. *See State v. Nebbitt*, 713 S.W.2d 49, 50–51 (Mo.App.1986). The evidence was sufficient to support Mr. Hawkins' conviction for unlawful use of a weapon.

Mr. Hawkins' third point is denied.

The judgment is affirmed.

All concur.

---

**3.** Section 562.016.3 provides that a person "acts knowingly": "(1) With respect to his conduct or to attendant circumstances when he is aware of the nature of his conduct or that those circumstances exist; or (2) With respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result."