

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | |
|---|---|
| STATE OF MISSOURI, ) | |
| ) | |
| Respondent, ) | |
| ) | WD77046 |
| v. ) | |
| ) | OPINION FILED: |
| ) | March 24, 2015 |
| GIOVANNI BARCELONA, ) | |
| ) | |
| Appellant. ) | |

**Appeal from the Circuit Court of Lafayette County, Missouri
The Honorable Dennis A. Rolf, Judge**

**Before Division Two:** Anthony Rex Gabbert, Presiding Judge, and
Joseph M. Ellis and Karen King Mitchell, Judges

Giovanni Barcelona was tried by a jury for the class D felony of unlawful use of drug paraphernalia, § 195.233,[1] the class D felony of failure to appear, § 544.665, the class A misdemeanor of operating a vehicle without a valid license, § 302.020, and the class B misdemeanor of making a false report, § 575.080. At trial, Barcelona admitted guilt as to the misdemeanor offenses, and the jury found him guilty of the two felony offenses. The court sentenced Barcelona, as a persistent felony offender, to a total of twelve years' imprisonment. In this appeal, he argues that the trial court erred in overruling his motion to suppress and admitting

---

[1] All statutory citations are to the Revised Statutes of Missouri 2000, as updated through the 2011 Cumulative Supplement, unless otherwise noted.

the fruits of an allegedly invalid traffic stop and that the evidence was insufficient to support either felony conviction. We affirm in part and reverse in part.

## Factual Background[2]

On February 19, 2012, just before 11:00 p.m., Lafayette County Sheriff's Deputies Dean Koch and Darren McFatrich were dispatched to a residence on Starr School Road, a gravel road in rural Lafayette County southeast of Odessa, Missouri, in response to a call from the homeowner. The homeowner had discovered a stranger on his property who he believed was there to commit a crime; consequently, the homeowner held the individual at gunpoint until the deputies arrived.

Upon their arrival, the deputies observed a man, later identified as Barcelona, with a late-90s-model, white Acura sedan. Barcelona identified himself as Jerry Hill and claimed that he had gotten lost on his way to Topeka, Kansas, after dropping a girl off in Kansas City. Barcelona did not know the girl's name, and he was located about five miles south of the interstate and approximately 30 miles in the opposite direction of Kansas City from Topeka. Though he was able to provide a date of birth, Barcelona could not produce any identification and did not know his social security number.[3] Barcelona was very jittery and nervous, and he kept moving around to the point that Deputy Koch had to advise him to stand still. Deputy Koch believed Barcelona to be under the influence of methamphetamine.

---

[2] Because Barcelona challenges the sufficiency of the evidence to support his convictions, we view the evidence and all reasonable inferences derived therefrom in the light most favorable to the convictions. *State v. Brooks*, 446 S.W.3d 673, 674 (Mo. banc 2014). Additionally, when evaluating a challenge to a pretrial ruling on a motion to suppress, this court considers evidence presented at both the suppression hearing and at trial. *State v. Lovelady*, 432 S.W.3d 187, 190 (Mo. banc 2014).

[3] A records check revealed a valid driver's license issued to a Jerry Hill.

Because Barcelona insisted that he just wanted to get back to Topeka and because the homeowner simply wanted Barcelona off of his property,[4] Deputy Koch determined that the best course of action was to lead Barcelona back to I-70 and direct him towards Topeka. Deputy Koch told Barcelona: "You are going to get behind me. You're going to follow me all the way to the interstate. I'm going to get on westbound I-70 and you just keep going until you see Topeka, Kansas signs and you are back where you want to be." Barcelona agreed, thanked the deputies, and followed Deputy Koch back to the interstate. Deputy McFatrich stayed behind briefly to talk with the homeowner before heading back towards westbound I-70 as well.

After traveling approximately one mile on westbound I-70, with Barcelona behind him, Deputy Koch received another dispatch call and sped ahead to respond. By this point, Deputy McFatrich had caught up and was trailing Barcelona. After Deputy Koch sped off, Deputy McFatrich saw Barcelona, who had been driving in the far left lane, abruptly change lanes without warning, cutting off a semi-truck in the process, and exit onto north Highway D in Bates City. There appeared to be no reason for Barcelona's abrupt departure from the interstate, as there were no service stations, restaurants, or other businesses a traveler might require on north Highway D. Deputy McFatrich followed Barcelona briefly on Highway D and contacted Deputy Koch to advise him of Barcelona's seemingly inexplicable actions.

Deputy Koch proceeded to north Highway D in search of Barcelona. He caught up with Deputy McFatrich behind Barcelona's vehicle; Deputy Koch then took the lead and followed Barcelona to see where he was going. Once Barcelona had driven approximately five miles north of the interstate, Deputy Koch initiated a traffic stop, and Deputy McFatrich stopped behind him. Barcelona stopped his vehicle in the middle of the road. Deputy Koch approached

---

[4] At trial, Deputy Koch noted that Barcelona may have committed trespass, but the homeowner was not interested in pressing charges.

3

Barcelona and asked why he was driving north away from the interstate. Barcelona advised that he was looking for a gas station. Deputy Koch pointed out that Barcelona had driven through two towns with multiple gas stations and had driven the opposite direction of the only gas station at the exit he had taken. Deputy Koch asked Barcelona: "I want to know who you are. What is your name?" Barcelona insisted that his name was Jerry, and when Deputy Koch advised Barcelona that he did not believe him, Barcelona swore that he was Jerry Hill.

Deputy Koch asked Barcelona to step out of the car and stand in front of Deputy Koch's vehicle. Barcelona appeared nervous and continued to fidget and move about incessantly. Deputy Koch asked Barcelona about the ownership of the car he was driving. Barcelona responded that he had been living in a motel and that a girlfriend's neighbor asked him to use the car to drop another girl off in Kansas City. Barcelona could not name either the girl he dropped off or the person that loaned him the car.[5]

Deputy Koch asked for permission to search the car, and Barcelona told him to "go right ahead." In the car, Deputy Koch noticed a backpack in the back seat, so he took it out of the car and brought it to Barcelona. Deputy Koch asked Barcelona if the backpack was his, and Barcelona confirmed that it was. Upon searching the backpack, Deputy Koch discovered syringes and a spoon with residue and cotton rolled up in the center. In his experience, Deputy Koch knew that these items could be used to ingest methamphetamine intravenously.[6] Deputy Koch also found some paperwork with the name Giovanni Barcelona on it, so he asked Barcelona if that was his name. Barcelona initially denied his identity, but after Deputy

[5] Subsequent investigation revealed that the owner of the car was a resident of Topeka, Kansas, who had reported the car stolen the day before the deputies encountered Barcelona.
[6] At trial, Deputy Koch explained that, to prepare methamphetamine for injection, methamphetamine users will put the methamphetamine into a spoon, add water to it and mix it up, then drop a cotton ball inside the spoon. They then insert the syringe needle into the cotton and draw the methamphetamine out, using the cotton ball as a filter.

4

McFatrich discovered a debit card bearing the same name in Barcelona's coat pocket, Barcelona admitted who he was. When asked why he had not provided his true identity, Barcelona indicated that he did not want to get in trouble because he did not have a valid driver's license. Barcelona began to calm a bit and advised the deputies that he had been awake for the last four or five days, using methamphetamine. Deputy Koch observed both of Barcelona's arms to have track marks approximately two inches long, suggesting intravenous drug usage. Deputy Koch field-tested the spoon, and it tested positive for the presence of methamphetamine. Later laboratory testing confirmed that the spoon held .02 grams of methamphetamine residue.

Barcelona was initially charged with first-degree tampering (driving the Acura without the owner's consent), possession of drug paraphernalia, driving without a valid license, and making a false report (for identifying himself as Jerry Hill).

Barcelona filed a motion to suppress the evidence and statements obtained following the stop, arguing—among other things—that Deputy Koch lacked reasonable suspicion for initiating the traffic stop on Highway D. After filing the motion, Barcelona posted bond. A hearing on the motion was scheduled for June 18, 2012, but Barcelona failed to appear. At the hearing, Barcelona's counsel relayed information from Barcelona to the court, suggesting that he had broken his ankle, developed an infection, and was in the hospital. His counsel further indicated that she had been unable to verify that information. The court advised Barcelona's counsel that Barcelona had until noon the following day (June 19, 2012) to appear, and if he failed to do so, the court would issue a warrant. When Barcelona failed to appear on June 19, 2012, the court ordered a warrant for his arrest and raised his bond from $10,000 surety to $15,000 cash only. On June 20, 2012, Barcelona sent the court what purported to be hospital "discharge

5

instructions." The instructions, faxed from a public library in Topeka, were reviewed by the court. The warrant issued the same day, but was not served until September 19, 2012.

In the interim, the State filed an amended information, including an allegation that Barcelona was a persistent felony offender. After Barcelona's arrest, the court held a hearing on the suppression motion, wherein it received testimony from both deputies. Following the hearing, the court denied the motion. The same day, the State filed another amended information, this time including a charge of failure to appear, with the underlying crime of first-degree tampering.

At some point, the owner of the Acura broke his back and became unable to travel. Because the victim was unable to attend the proceedings, the State sought several continuances and the court agreed to reinstate Barcelona's original bond, allowing him out of jail again. On July 1, 2013, Barcelona again failed to appear for a scheduled hearing. The court ordered a second warrant and raised Barcelona's bond to $25,000 cash only. The warrant issued July 3, 2013, and Barcelona was arrested on July 22, 2013.

At trial, the State dismissed the first-degree tampering charge, Barcelona admitted guilt of the two misdemeanor offenses, and the jury found him guilty of all charged offenses. The court sentenced him, as a persistent offender, to a total of twelve years' imprisonment. Barcelona appeals.

**Analysis**

Barcelona raises three claims on appeal. First, he argues that the trial court erred in both overruling his motion to suppress and in admitting evidence that was obtained post-stop at trial. He claims that Deputy Koch lacked reasonable suspicion to initiate the traffic stop on Highway D and, therefore, any evidence obtained as a result of that illegal stop should have been

6

suppressed under the exclusionary rule. Second, he claims that the evidence was insufficient to support his felony charge of possession of drug paraphernalia. Barcelona argues that, to be a felony, the paraphernalia must be capable of use in the manufacture of methamphetamine and not merely the preparation for ingestion. He argues that, because the items he possessed could not be used to manufacture methamphetamine, he could be charged with only misdemeanor— and not felony—unlawful use of drug paraphernalia. Finally, Barcelona argues that the evidence was insufficient to support his conviction of failure to appear. More specifically, he claims that the State failed to prove that his failure to appear was willful in that his nonappearance was due to a hospitalization beyond his control. We affirm in part and reverse in part.

**A. The traffic stop was supported by reasonable suspicion.**

An appellate court "reviews a trial court's ruling on a motion to suppress in the light most favorable to the ruling and defers to the trial court's determinations of credibility." *State v. Stover*, 388 S.W.3d 138, 149 (Mo. banc 2012). "Review is limited to determining whether the decision is supported by substantial evidence." *Id*. "Analysis of whether conduct violates the Fourth Amendment is an issue of law that [we] review *de novo*." *Id*.

Barcelona argues that the stop was not justified by any traffic violations and, thus, if justifiable, it must have been so under the principles articulated in *Terry v. Ohio*, 392 U.S. 1 (1968).

In *Terry*, the United States Supreme Court held that "a police officer may[,] in appropriate circumstances and in an appropriate manner[,] approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry*, 392 U.S. at 22. "[I]n justifying the particular intrusion[,] the police officer must be able to point to specific and articulable facts which, taken together with rational inferences

7

from those facts, reasonably warrant that intrusion." *Id*. "The principles of *Terry* have been applied to permit a police officer to briefly stop a moving automobile to investigate, if the officer has a reasonable suspicion that its occupants are involved in criminal activity." *State v. Hawkins*, 137 S.W.3d 549, 557 (Mo. App. W.D. 2004).

Before we can address the facts underlying the deputies' reasons for stopping Barcelona, we must address Barcelona's argument that we cannot consider any facts occurring during his initial encounter with the deputies on Starr School Road. Barcelona essentially claims that none of those facts are relevant to the constitutionality of the traffic stop because the deputies decided to release him after the initial encounter. In support of his argument, Barcelona relies upon a line of "second stop" cases, wherein a law enforcement officer stopped a vehicle based upon reasonable suspicion, and, following investigation, concluded the stop without further action only to stop the same vehicle shortly thereafter merely for the purposes of continuing the initial investigation. *See, e.g., United States v. Peters*, 10 F.3d 1517, 1522 (10th Cir. 1993) (holding that an officer that releases a suspect following a *Terry* stop, due to the failure to develop probable cause, may not stop the suspect again a few miles down the road to make a second *Terry* stop "based solely on the conduct that has already proved to be illusory" during the first stop).

We find these "second stop" cases to be inapplicable to the situation at hand. First, the deputies' initial encounter with Barcelona was not the result of a *Terry* stop at all; rather, the initial encounter was in response to a call from the homeowner who found Barcelona on his property, at night, without justification. It was the homeowner—not the deputies—that created the initial intrusion on Barcelona's freedom. "[I]t is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in

8

the apprehension of criminals." *Coolidge v. New Hampshire*, 403 U.S. 443, 488 (1971). "Thus, 'the protection of the [F]ourth [A]mendment against unreasonable search and seizure does not apply to actions of private individuals not acting pursuant to a request by the police[,]' no matter how unreasonable . . . ." *State v. Marshall*, 410 S.W.3d 663, 674 (Mo. App. S.D. 2013) (quoting *State v. Brasel*, 538 S.W.2d 325, 330 (Mo. banc 1976)).

Second, the deputies' decision to release Barcelona was not the result of them dispelling any pre-existing reasonable suspicion; in other words, the release was not dictated by the holding in *Terry*.[7] Rather, their decision to release him was the result of Barcelona's stated desire to simply return to Topeka, coupled with the homeowner's desire not to press charges so long as Barcelona left his property. Accordingly, the underlying rationale of the "second stop" cases is not present under these facts. In other words, the initial encounter with Barcelona did not dispel any of the deputies' suspicions about Barcelona; rather, they decided to show him mercy and allow him to leave without further action on the condition that he follow them to the highway and return to Topeka.

Because the "second stop" cases do not apply, we evaluate the validity of the stop under the totality of circumstances known to the deputies at the inception of the stop. *State v. Lovelady*, 432 S.W.3d 187, 191 (Mo. banc 2014) ("When evaluating the validity of a *Terry* stop, the trial court must consider the totality of the circumstances."). Here, Barcelona was found on private property at night, five miles south of the interstate in rural Lafayette County, and approximately 30 miles in the opposite direction of Kansas City from his stated destination. He appeared to be under the influence of methamphetamine; he was exceptionally nervous; he could

---

[7] On the contrary, the officers likely had probable cause to arrest Barcelona at that point for first-degree trespass, which occurs when a person "knowingly enters unlawfully or knowingly remains unlawfully . . . upon real property[,] . . . as to which notice against trespass is given by: (1) Actual communication to the actor." § 569.140.1-.2(1). Because the homeowner, however, did not want to press charges, the deputies did not arrest Barcelona.

9

not provide identification or a social security number; and he did not know the name of the person he supposedly dropped off in Kansas City. He was emphatic about returning to Topeka, but then inexplicably and abruptly exited the interstate, after being advised not to do so until he reached his destination, and he did so only after the deputy he was following had to speed up to respond to another call.

Thus, the stop was supported by reasonable suspicion, and the trial court did not err in either overruling Barcelona's motion to suppress or admitting the evidence obtained after the stop at trial.

Point I is denied.

## B. The evidence did not support the felony conviction of possession of drug paraphernalia.

In his second point, Barcelona argues that the evidence was insufficient to support his conviction of felony possession of drug paraphernalia under § 195.233. He argues that the evidence did not support the requirements for the enhanced felony offense. We agree.

> It is unlawful for any person . . . to possess with intent to use . . . drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce in the human body a controlled substance or an imitation controlled substance in violation of sections 195.005 to 195.425.

§ 195.233.1. Subsection 2 provides that a violation of this section constitutes a class A misdemeanor "unless the person . . . possesses with intent to use . . . the paraphernalia in combination with each other to manufacture, compound, produce, prepare, test or analyze . . . methamphetamine . . . in which case the violation of this section is a class D felony."

Possession of drug paraphernalia with intent to use for manufacture, compounding, preparing, testing, or analyzing *any* controlled substance can constitute a class A misdemeanor.

10

*See* § 195.233.1 (identifying various uses as "to plant, propagate, cultivate, grow, harvest, *manufacture*, *compound*, convert, produce, process, *prepare*, *test*, *analyze*, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance" (emphasis added)).  But possession of more than one item of drug paraphernalia with any of these specific intended uses renders the crime a felony only if the substance at issue is amphetamine, methamphetamine, or any of their analogues.  Thus, the distinction lies in the nature of the intended use, *coupled with* the nature of the substance to be used (amphetamine, methamphetamine, or their analogues) and the number of items of paraphernalia possessed at any given time.

Barcelona argues that possession of drug paraphernalia is a felony only if the intended purpose of the possession is to manufacture—as opposed to inject or ingest—methamphetamine. Barcelona argues that "prepare," in the context in which it is used, means essentially "manufacture."  He gleans this meaning from the fact that the legislature omitted other intended uses that are available for the misdemeanor offense.  Essentially, Barcelona breaks the intended uses down into four categories:  those related to plant-based substances (plant, propagate, cultivate, grow, harvest), those related to manufacturing and production (manufacture, compound, convert, produce, process, prepare, test, analyze), those related to packaging and storage (pack, repack, store, contain, conceal), and those related to consumption (inject, ingest, inhale, or otherwise introduce in the human body).  He then reasons that, because the only intended uses applicable to the felony offense are those related to manufacturing and production, the legislature intended to exempt all other intended uses from felony punishment.  And because the spoon, cotton ball, and syringe were intended for use only to ingest methamphetamine, rather than manufacture it, Barcelona could not be guilty of the felony.

The State, on the other hand, argues that we must give each word in the statute meaning; thus, "prepare" cannot mean "manufacture," as suggested by Barcelona, because "manufacture" is already an identified use in both the misdemeanor and the felony. And if we are to give meaning to each word, "prepare" must cover a usage distinct from "manufacture."

We agree with the State that "[o]ne of the 'rules' of statutory interpretation is that all words utilized by the legislature are presumed to have separate and individual meaning." *State v. Carouthers*, 714 S.W.2d 867, 870 (Mo. App. E.D. 1986). "That rule is essentially a presumption against redundancy." *Id*. "'[R]ules' of statutory interpretation[, however,] are not strictly rules, but merely aids to guide the courts in determining the legislative intent." *Id*. Thus, "[i]f the statute clearly evidences that it was intended to be redundant, there is no reason to apply a guideline that presumes that the statute is *not* redundant." *Id*. (emphasis added).

In *Carouthers*, the defendant was charged with possession of a controlled substance under the 1984 version of § 195.020.1, which provided: "It is unlawful for any person to manufacture, possess, have under his control, sell, prescribe, administer, dispense, distribute, or compound any controlled or counterfeit substance except as authorized in Sections 195.010 to 195.320." *Carouthers*, 714 S.W.2d at 869. The verdict-directing instruction, however, referred not to possession, but to control. *Id*. Thus, the issue before the court was whether the legislature intended for possession and control to be two separate offenses, such that the deviation between the charge and the instruction constituted a fatal variance, or whether they were, in fact, the same crime, such that the variance was not fatal to the resulting conviction. *Id*.

The Eastern District first noted that, "[i]n a pristine sense[,] 'possession' and 'control' may have different meanings." *Id*. Specifically, the distinction existed if "possession" were considered to include only actual physical possession of an object. *Id*. Under that definition, a

12

person would have simultaneous possession and control. *Id*. But, the court noted, "[a] person could . . . have 'control' of a substance when it is not actually in his physical possession, as with a substance located in his home, automobile, or safe deposit box." *Id*. The court noted, however, that because "possession" legally exists if it is either actual or constructive, "the difference between ["possession" and "control"] is virtually obliterated." *Id*. at 869-70.

As with "possession" and "control," in a "pristine sense," "manufacture" and "prepare" could have distinct meanings. "Prepare" can mean "to make ready beforehand for some purpose: put into condition for a particular use, application or disposition,"[8]—a meaning advocated by the State that would be distinct from "manufacture." Or it can mean "to put together: compound . . . make, produce"[9]—a meaning advocated by Barcelona that is wholly subsumed by "manufacture."

While both definitions present problems under the "rules" of statutory interpretation, we find Barcelona's definition to be less troublesome. The problem with the State's definition is that it requires more than the statute provides; to "prepare" in the sense advocated by the State requires an additional purpose. In other words, one must prepare methamphetamine *for* a distinct purpose or use. Here, both parties agree that Barcelona's end purpose was ingestion of the methamphetamine: he was using the spoon, cotton ball, and syringe to prepare the methamphetamine for ingestion. Though this intended purpose is clearly an unlawful one, the State's definition would necessarily include lawful purposes as well. For example, a prosecutor might prepare methamphetamine for use as an exhibit at trial, or a scientist might prepare methamphetamine for use in an experiment.

---

[8] WEBSTER'S THIRD NEW INT'L DICTIONARY at 1790 (1993).
[9] *Id*.

13

The statute already precludes possession of drug paraphernalia with the intent to use it for ingestion. It would seem that the possession of paraphernalia, in and of itself, would always be deemed preparation for one of the prohibited uses. This interpretation thus obliterates the distinction between the misdemeanor and the felony when it comes to methamphetamine. And if the legislature intended to make *all* methamphetamine-related uses of drug paraphernalia a felony, it would not have needed to identify the specific uses laid out in subsection 2.

Accordingly, while both proposed definitions tend to render the word, "prepare," redundant in some sense, Barcelona's definition preserves the intended distinction between the misdemeanor and the felony, whereas the State's definition does not. Because there was no evidence demonstrating that the spoon, cotton ball, and syringe could be used in combination to manufacture, compound, produce, test, or analyze methamphetamine, Barcelona's felony conviction cannot stand. Thus, we reverse his conviction for the class D felony of possession of drug paraphernalia.

That being said, "[w]e 'may enter a conviction for a lesser offense if the evidence was sufficient for the jury to find each of the elements and the jury was required to find those elements to enter the ill-fated conviction on the greater offense.'" *State v. Gray*, 446 S.W.3d 291, 296 (Mo. App. W.D. 2014) (quoting *State v. Whalen*, 49 S.W.3d 181, 187-88 (Mo. banc 2001)). Thus, if the misdemeanor offense constitutes a lesser-included offense of the felony, and the jury made sufficient findings to support the misdemeanor, then we may enter a conviction for the misdemeanor. According to § 556.046.1, a lesser offense is included within a greater if:

> (1) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or

> (2) It is specifically denominated by statute as a lesser degree of the offense charged; or

14

(3) It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein.

Here, neither subsection (2) nor subsection (3) applies. Therefore, if the misdemeanor is to be considered a lesser-included offense, it must satisfy the requirements of subsection (1). It appears that it does not.

Subsection (1) is a codification of the "same elements" test laid out in *Blockburger v. United States*, 284 U.S. 299 (1932). *State v. Reando*, 313 S.W.3d 734, 738 (Mo. App. W.D. 2010). "The focus is on the elements of the offenses at issue, not the underlying conduct that resulted in the defendant being charged." *State v. Daws*, 311 S.W.3d 806, 808 (Mo. banc 2010). "'[W]e simply determine the elements of the offenses at issue and compare them. If this comparison establishes that they do not each have an element that the other offense lacks,'" then one is a lesser-included offense of the other. *Reando*, 313 S.W.3d at 738 (quoting *State v. Clark*, 263 S.W.3d 666, 671 (Mo. App. W.D. 2008)).

The elements of the felony are: (1) possession of more than one item of drug paraphernalia; (2) that can be used in combination; (3) for the purposes of manufacturing, compounding, producing, preparing, testing, or analyzing; (4) amphetamine, methamphetamine, or any of their analogues. § 195.233.2. The elements of the misdemeanor are: (1) possession of drug paraphernalia; (2) for the purposes of planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packing, repacking, storing, containing, concealing, injecting, ingesting, inhaling, or otherwise introducing in the human body; (3) a controlled substance or an imitation controlled substance. § 195.233.1. The elements, though somewhat overlapping, are not necessarily the

15

same.  The misdemeanor, depending upon how it is charged,[10] requires proof of purposes distinct from those of the felony.

Here, even though "prepare" is a prohibited use under both the misdemeanor and the felony, as we discussed above, the term means essentially "manufacture."  As there was no evidence to support a finding of "manufacture," then Barcelona cannot be guilty of the misdemeanor, as charged, either.  In order for us to enter a conviction for the misdemeanor, the jury had to have found facts supporting Barcelona's purpose to inject or ingest the methamphetamine.  While there was certainly evidence to support such a finding, the jury was not charged with making such a finding by the verdict director.  Under the verdict director, the jury found only that Barcelona intended to use the spoon, cotton ball, and syringe for the purpose of "preparing methamphetamine."  The jury was *not* charged with finding that Barcelona intended to prepare the methamphetamine for ingestion or injection.  And because "prepare" is not synonymous with "ingest" or "inject," we lack sufficient findings to enter a conviction for the misdemeanor.

Point II is granted.

**C. The evidence was sufficient to support the conviction of failure to appear.**

In his final point, Barcelona argues that the evidence was insufficient to support his conviction of failure to appear; specifically, he claims that the State failed to prove that his non-appearance was intentional.  We disagree.

"[A]ny person who, having been released upon . . . bond . . . while pending . . . trial, . . . or any other stage of a criminal matter against him . . . , knowingly fails to appear before any

---

[10] *See State v. Kamaka*, 277 S.W.3d 807, 814 (Mo. App. W.D. 2009) (holding that, where a criminal statute provides for various methods of commission, the lesser-included offense analysis requires the court to examine the specific method charged, rather than other available but uncharged methods).

16

court or judicial officer as required shall be guilty of the crime of failure to appear." § 544.665.1.

Barcelona argues that the State failed to prove that his failure to appear was done knowingly because he was physically unable to appear due to hospitalization. There are several flaws in this claim. First, Barcelona presented no evidence whatsoever to support his assertion that he was physically unable to appear. The only evidence he presented was a document found in the court file that appeared to be a fax to his attorney. This document consisted of *discharge* papers from a hospital in Topeka, Kansas, purportedly demonstrating that Barcelona broke his ankle, was treated, *and released* on June 16, 2012. The appearance for which he failed to appear occurred on June 18, 2012—two days after the purported release. And, in any event, the document was admitted not for its contents, as those were hearsay, but only for the fact that the document was present in the court file.

The second flaw in his analysis is that, even if the document had been admitted for its content, and even if it had demonstrated that he was hospitalized at the time of the hearing, it still would not excuse his failure to appear. The court advised Barcelona's counsel that she had until noon the following day (June 19, 2012) to present Barcelona; if she failed to do so, the court would order a warrant. Thus, even if the document could have justified Barcelona's absence on June 18, 2012, it said nothing of his absence on June 19, 2012, and thus would not have satisfied the court's order.

The evidence presented demonstrated that Barcelona was out on bond, that he knew of the June 18, 2012 hearing, and that he did not appear thereafter in court until October 2012, after he was apprehended on the *capias* warrant. Thus, the evidence was sufficient to support Barcelona's conviction for failure to appear.

17

Point III is denied.

## Conclusion

Because the deputies had reasonable suspicion to stop Barcelona's vehicle, the trial court did not err in either overruling the motion to suppress or admitting the fruits of the stop as evidence at trial. The evidence presented at trial was sufficient to support Barcelona's failure to appear conviction. It was not, however, sufficient to support his felony conviction for possessing drug paraphernalia. Accordingly, that conviction and sentence are reversed. The judgment below is affirmed in all other respects.

_____
Karen King Mitchell, Judge

Anthony Rex Gabbert, Presiding Judge,
and Joseph M. Ellis, Judge, concur.