**STATE of Missouri, Respondent,**

v.

**Lynn Wayne HESTER, Appellant.**

**No. 47318.**

Supreme Court of Missouri,
Division No. 3.

March 11, 1968.

Norman H. Anderson, Atty Gen., Jefferson City, Thomas J. O'Brien, Sp. Asst. Atty. Gen., Kansas City, for respondent.

David E. Blanton, Sikeston, for appellant.

ROBERT L. ARONSON, Special Judge.

Defendant was found guilty, by verdict of a jury, of the offense of Murder in the First Degree on June 21, 1958. In due course he was allowed in forma pauperis to perfect an appeal to this court. The judgment of conviction was affirmed on February 8, 1960, in an opinion reported at Mo., 331 S.W.2d 535.

Although defendant was represented by privately employed counsel at his trial, no one briefed or argued his cause of action on appeal. This court fully complied with the requirements of its rules then in effect, and covered in its opinion the matters required to be ruled. However, subsequent opinions of Federal courts (Bosler v. Swenson, 8 Cir., 363 F.2d 154 and Swenson v. Donnell, 8 Cir., 382 F.2d 248) have disapproved this procedure. Therefore the prior affirmance has been set aside, an order has been made directing the trial court to appoint counsel to brief and argue the case on appeal (which was done) and the case has now been re-presented on briefs and oral arguments.

We need not repeat in full the statement of the facts as delineated in the opinion in 331 S.W.2d loc. cit. 536; and factual references herein will be limited to the necessities in connection with our ruling on the live issues. Based on the testimony of appellant's accomplice, Joe Slayton, he and appellant left Chaffee, Missouri, on January 5, 1957, in a stolen automobile, looking for filling stations to hold up. In time they drove into Sikeston, where they saw a young man named Johnnie Malugen and a girl June parked in an automobile. Appellant suggested that they "take this girl away from her boy friend." He stopped the stolen automobile, they both put on black masks and appellant walked to the left side of the automobile in which the couple were sitting. He opened the left door and ordered the young man out. Malugen slammed the door shut, appellant opened it again and immediately fired two shots. The girl attempted to run away, but was caught by Slayton and was raped by him.

More than a year later, in February, 1958, while confined in the reformatory at Boonville for automobile theft, Slayton wrote to his mother, in order to ease his conscience, and informed her that appellant had shot Johnnie and that he had raped June. After interviewing Slayton, the officers arrested appellant at his mother's home in Wellston on February 20, 1958.

Present counsel for defendant, while making the contentions hereinafter to be considered, says in his brief that he "has reviewed other points raised by the Motion for a New Trial, and has considered the opinion written by this court in affirming the conviction. The cases as cited and relied upon by the court seem to have covered the points * * *." Also, in oral argument he conceded that the court had adequately covered the points raised before, and that the opinion correctly disposed of the issues then before the court. Of course, these concessions are commendable, for no attorney is required to stultify himself by presenting arguments he cannot conscientiously assert. See State v. Ball, Mo., 408 S.W.2d 17, 19.

The contention now vigorously made, in several forms, is that appellant's rights against self-incrimination under the Fifth Amendment of the Constitution of the United States were violated by the use in evidence of written and oral confessions; and the case relied upon as authority is

Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, decided June 13, 1966.

From the opinion in State v. Aston, Mo., 412 S.W.2d 175, loc. cit. 183, we quote: "In Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882, the Court held that the sundry admonitions announced in the case of Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, did not apply to any prosecution in which the trial was started before June 13, 1966. They are, therefore, inapplicable here." See also State v. Rapp, Mo., 412 S.W.2d 120, loc. cit. 125, State v. Holland, Mo., 412 S.W.2d 184, loc. cit. 186, and State v. Dixon, Mo., 411 S.W.2d 185, 186.

■ As noted at the outset of this opinion, the instant case was tried in June, 1958. Therefore the Miranda case has only tangential interest, as is true also of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. Again reverting to State v. Aston, supra, 412 S.W.2d loc. cit. 183, "In this situation we consider the 'totality of the circumstances' surrounding the making of the statements. State v. Beasley, Mo., 404 S.W.2d 689, and cases there cited and discussed, including Escobedo. See also State v. Craig, Mo., 406 S.W.2d 618."

Some matters which appear in the Transcript on Appeal herein are of special significance. When the written statement, State's Exhibit A, was produced during the testimony of Deputy Sheriff Michael, the witness testified that defendant signed the statement and in his own handwriting wrote the words, "I have read the above statement which is true. Lynn Hester." There was then a recess to allow defendant's attorney to read the Exhibit. Following the recess the Prosecuting Attorney offered it in evidence. "The Court: Any objection? Mr. Munger (defendant's attorney): No." The Exhibit (which incidentally is not included in the transcript) was not read to the jury until after a prolonged cross-examination of the witness. There was no complaint in defendant's Motion for a New Trial that the statement or confession should not have been received in evidence.

Thus it is clear that during the trial the defense did not assert its right to a preliminary consideration by the court of the question of the voluntariness of the confession. In effect, the admissibility of the Exhibit was conceded.

In State v. Hill, Mo., 419 S.W.2d 46, when a gun was offered in evidence, defense counsel said, "No objection." It was held that in this circumstance defendant had no right afterwards to challenge the admissibility of the gun in evidence. Similarly in State v. Simone, Mo., 416 S.W.2d 96, loc. cit. 100, and in State v. Holbert, Mo., 416 S.W.2d 129, loc. cit. 131–132, it was held that an affirmative waiver of a possible objection bars the later presentation of an objection. In these instances the objection was based on a theory of unlawful search and seizure.

The positive statement of defendant's privately employed counsel that he had no objections to the receipt in evidence of the written confession, and the absence of any objection to testimony of oral confessions thereafter made, could well provide adequate basis for a holding here that objection has been waived at the time of trial and cannot be presented in this court on appeal. Whether or not to make an objection, or to declare openly before the jury that there was no objection, is often a matter of trial strategy, on the part of an experienced trial lawyer, such as defendant's trial counsel in this case. However, we prefer not to rule this issue on what might be considered to be a technical ground, and we shall proceed to consider the admissibility of the confession as a voluntary statement, under the "totality of circumstances" rule mentioned above.

As already stated, defendant was arrested at his mother's home in Wellston, about 6:25 p. m. on February 20, 1958. He was

taken to the Wellston police station for a brief time and he made no complaint of any mistreatment or compulsion directed toward him there. He was then taken to the headquarters building of the St. Louis police department. Here he was questioned on the evening of February 20 and was permitted to make a telephone call to his mother. On the morning of February 21 he consented to a lie detector test. In his testimony he made no complaint of his treatment at the St. Louis headquarters. On the afternoon he was taken in the automobile of Sheriff Dennis of Scott County from St. Louis to the Sheriff's office in Benton. The Sheriff was accompanied by the Police Chief of Sikeston and by the Prosecuting Attorney of Scott County. Before leaving St. Louis they had also stopped at a bank and had picked up, for the ride, the brother of the Prosecuting Attorney, who previously had been a Circuit Judge. Two stops were made en route for gasoline and food, and there was no complaint of mistreatment during that journey. The party arrived at the Sheriff's office in Benton in the early evening, variously estimated at 6:30 to 7:00 p. m. The Prosecuting Attorney and the Police Chief went on their way, and the other passenger had left the car in Cape Girardeau. The Sheriff and his Chief Deputy, Aubra Michael, questioned defendant. Deputy Sheriff Clayton brought some sandwiches and drinks. Sheriff Dennis left his office at times to attend to other business. Sheriff Scott of Mississippi County was present for a time after he brought a prisoner to Benton. Chief of Police Bruce of Sikeston was present for a time.

Defendant testified that he was told by the Sheriff and his Chief Deputy that they had the gun used in the killing of Johnnie Malugen and had found defendant's fingerprints on the gun and on the car and on the porch of the nearby house where the rape had occurred. He was also told, he said, that they had witnesses who would say he had scratches on his face. In time Joe Slayton's statement or parts thereof were read to him. Deputy Sheriff Michael was the one who read the statement of Slayton. After Slayton's written statement was read, the defendant, who previously had said nothing or claimed he did not know what his questioners were talking about, was urged that he might as well tell the truth and get it off his conscience. Finally he told them that he had shot Malugen and he signed the written confession, which had been typewritten by Mrs. Schaerer, the Sheriff's secretary and deputy who had been brought from her home for the typing of the written statement.

When asked by his counsel why he signed the statement, defendant said that it was because he was beaten, that Michael had used his knuckles and the palm of his hand and that Dennis had hit him once with the palm of his hand and hit him across the chest with two Life magazines rolled up.

The next morning, February 22, the Sheriff, his Chief Deputy and defendant left Benton for Chaffee. They had breakfast together in a public restaurant.

Defendant was taken to a hill east of Chaffee, where a search was made for the gun. The officers testified that he had told them the gun had been thrown away in this area, but defendant testified that he did not lead the officers there, they just took him along. When they asked him to show where he had thrown the gun, he said, "Well, this isn't the spot." No gun was found.

They then went to the home, in Chaffee, of defendant's grandmother, where his aunt and mother were also present. In the presence of the Police Chief of Chaffee and the Police Chief of Sikeston, he was permitted to go into the house, where he talked with his mother, his aunt, and his grandmother. He made no complaint to them that he had been beaten.

The officers and the defendant talked to defendant's uncle, Ross Gregory, while

in Chaffee. He was called as a defense witness and testified on cross-examination that defendant told him that he had shot the boy; also the defendant told him that he got the pistol from the uncle's house, but the uncle denied that he had a .32 caliber pistol. When defendant became a witness immediately following his uncle, he did not deny this conversation.

The next day, which was February 23, defendant was taken from Benton, the county seat, to Sikeston. There he was brought into the presence of June, the victim of the rape, and her mother. June testified that he told her at this confrontation that he had shot Johnnie Malugen.

It should be noted that the Sheriff testified that he had given defendant advice as to his rights, to the effect that he need not answer questions and that anything he might say could be used against him, in the Wellston City Jail, at the St. Louis Police Headquarters, and again at the Sheriff's office in Benton.

In rebuttal, Sheriff Dennis and Deputy Michael contradicted the testimony of defendant as to the alleged force. Both testified that neither of them had laid a hand on the defendant, had not threatened him nor promised him anything.

In the circumstances disclosed by this record, must uncorroborated statements of the defendant be accepted as against all the other evidence in the case? "Totality of circumstances" must mean a careful, conscientious appraisal by this court of all the evidence that bears on the present claim of involuntariness of the confession.

The claim that a confession was induced by force is very easy to make; and one who may have hope that this claim will evoke sympathy or otherwise aid his cause has an obvious motive to make it. There are times when a court should be skeptical of such a claim.

The assertion that defendant was beaten as set forth in defendant's testimony has very little detail; it is like a skeleton with very little flesh. There was no testimony as to how long a time he was beaten, nor how many blows were struck. There is no proof of even the slightest mark, bruise or discoloration. Not only did none of the witnesses to his signature on his confession see any physical results of physical force applied to his face or body, but he made no complaint when he saw his mother, his grandmother and his aunt in Chaffee the next morning, nor when he saw his uncle. His aunt and grandmother gave testimony for the defendant and neither of them testified to any mark or sign of injury, nor to any complaint by the defendant. His uncle testified to nothing about signs of injury nor of complaint.

Defendant's credibility on this aspect of his testimony, as well as on his denial of guilt and all his testimony, is very slight, if notice is taken that he was contradicted by the witness June as to his admission to her that he had shot Johnnie Malugen, he was contradicted by his uncle as to his admission to him, he was contradicted by the testimony of his accomplice, Joe Slayton, and he was contradicted by the officials who testified, Sheriff Dennis, Chief Deputy Sheriff Michael and Chief of Police Bruce.

It should be obvious that the overwhelming weight of the evidence in this case established that the confessions, written and oral, were given freely and voluntarily. It is not necessary that a person approach a law officer and blurt out an unsolicited confession in order to make his admissions voluntary. When there is no substantial evidence of coercion or duress or of promises of leniency or reward, a confession must be deemed voluntary. Here it was a voluntary act on the part of defendant to admit his guilt after he had heard read to him the signed statement of his companion, Joe Slayton, apparently along the same lines as incriminating testimony at the trial.

Defendant was only 18 years of age at the time of his arrest in 1958. Must the solitary fact of his youth cause courts to

blind themselves to the overwhelming weight of the evidence and to the complete lack of corroboration of defendant's claim of coercion?

The cases on which defendant relies as authority for holding that under the "totality of circumstances" his confession here should be ruled inadmissible are very different indeed from this case on their facts. Defendant cites Davis v. State of North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895, and Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837. In the Davis case the prisoner was questioned repeatedly over a period of 16 days. There was no evidence that he was informed of his rights until after he had made an oral confession on the 16th day, and he had repeatedly denied guilt until the 16th day. He was a man of third or fourth grade education. A police officer testified that no one had ever been kept in the city jail so long as he. The arrest sheet of the police department contained the notice that no one was to be allowed to see him, nor was he to be allowed the use of a telephone. No one except police officers saw him during his 16-day ordeal. He was fed two sandwiches per day and lost 15 pounds. Not until the 13th day of the inquiry was he told of the charge on which he was later brought to trial. He was caused to walk 14 miles on a railroad right-of-way with the police in order to destroy his explanation of his possession of some personal items found at his home and was taken to the cemetery, scene of the murder. The Supreme Court of the United States ruled that the prolonged questioning of this man under the circumstances outlined in the opinion had exerted a substantial coercive effect upon him. His will had been eroded by the lines of interrogation that had been pursued. He had been isolated from all but police officers and his confession was held to be the involuntary end product of coercive influences, the product of a will overborne.

Fay v. Noia, supra, was principally concerned with the effect of a failure to appeal a state court conviction. Previous to the decision in the Noia case, the prisoner's two companions had been freed in earlier cases because their convictions were based upon confessions obtained by third degree methods. It was repulsive to the court's sense of justice that Noia should remain a prisoner after the release of his co-defendants. It was found that his failure to appeal was not the exercise of a free and intelligent choice and therefore in the federal habeas corpus proceeding, he obtained the same result as his co-defendants had obtained.

Another interesting case, not cited to us by defendant, is Clewis v. State of Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423, decided April 24, 1967. Here the Supreme Court of the United States reversed a conviction for murder of defendant's wife, based upon three statements of defendant which had been received in evidence. The decision was based upon the State's version of the facts, which in the view of the Supreme Court of the United States, considering the "totality of the circumstances," were not voluntary and should have been excluded. Clewis was arrested on July 8, 1962, and gave a statement to the police on the afternoon of July 9. He was not taken before a magistrate until he had been in custody for 38 hours and had had very little sleep and very little food and appeared to be sick. He gave a second statement to the police on July 12, after frequent interrogation from a Monday evening to a Thursday afternoon. During this period he was driven on a round trip of 6,600 miles, was administered several polygraph tests, had very little to eat and little contact except with policemen. He still maintained his innocence to this time. On July 13 he was delivered to the custody of the county Sheriff. Interrogation was resumed on July 17. Defendant had seen no lawyer, nor had he been advised of his right to have one. On July 17 a written statement was prepared, which Clewis signed. Thus the alleged confession was made nine days after the time of the

arrest. Interrogation proceeded for more than a week after arraignment. The court stated that it was concerned as to the extent to which Clewis' faculties were impaired by inadequate sleep and food, sickness and long subjection to police custody, with little or no contact with anyone other than police.

In the instant case the defendant was permitted to make a telephone call to his mother from St. Louis police headquarters before he was taken to Benton, this being the second call he made after his arrest. He was adequately fed at all times. The confession came approximately three hours (or, at the longest, five hours) after he was brought to the Sheriff's office in Benton, and it followed shortly after the disclosure of the statement made by his companion and accomplice.

We have examined numerous other "totality of circumstances" cases, including State v. Beasley, Mo., 404 S.W.2d 689; State v. Smith, Mo., 415 S.W.2d 748; State v. Walker, Mo., 416 S.W.2d 134; State v. Williams, Mo., 416 S.W.2d 956, and State v. Simone, Mo., 416 S.W.2d 96. The conclusion we have reached in this case is in harmony with the other decisions.

The courts of Missouri have long recognized that mental coercion can invalidate a confession. See State v. Williams, Mo., 369 S.W.2d 408, 418, and State v. Barnett, Mo., 338 S.W.2d 853. In the instant case the defendant did not testify to any mental coercion. The Barnett case, supra, stands for the proposition also that urging a prisoner to tell the truth and clear his conscience does not constitute mental coercion (loc. cit. 857).

The testimony of Sheriff Dennis that he warned defendant that he need not say anything and that anything he told could be used against him and that he could call his mother or an attorney if he so wished, as well as the testimony of Deputy Sheriff Michael that he heard the Sheriff advise defendant of his constitutional rights and that he could have the advice of counsel if he wanted it, were given at a trial held in June, 1958, long before the Miranda case was decided, and should not be discounted as a partial effort to satisfy the requirements of the Miranda case.

 Under the total circumstances disclosed by the record in this case, it is our conclusion that the written confession of defendant and his later oral confession were voluntary and that the court did not err in receiving same into evidence.

The judgment of conviction is affirmed.

EAGER, P. J., and GREEN, Special Judge, concur.