

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| | ) | |
| v. | ) | WD84161 |
| | ) | |
| THOMAS STEVE HIGGS, | ) | Opinion filed:  May 3, 2022 |
| | ) | |
| Appellant. | ) | |

**APPEAL FROM THE CIRCUIT COURT OF BOONE COUNTY, MISSOURI**
**THE HONORABLE J. HASBROUCK JACOBS, JUDGE**

Division Four:  Cynthia L. Martin, Chief Judge,
Thomas N. Chapman, Judge, and W. Douglas Thomson, Judge

Thomas Higgs ("Higgs") appeals from the judgment of the Circuit Court of

Boone County convicting him of the class D felony of unlawful possession of a firearm

after a bench trial.  In his four points on appeal, Higgs contends that the trial court

clearly erred in denying his motion to suppress and in admitting such evidence at

trial over his objections because (1) the arresting officer racially profiled Higgs in

finding reasonable suspicion to perform a *Terry* stop; (2) the totality of the

circumstances did not support a finding of reasonable suspicion to perform a *Terry*

stop; (3) the arresting officer's actions from the outset were not consensual and

constituted a seizure; and (4) the failure to provide a *Miranda*[1] warning prior to custodial interrogation rendered both the statement and physical evidence inadmissible.  We affirm.

## Factual and Procedural History

On December 31, 2018, around 6:00 p.m., Columbia Police Officer Joshua Popielarz ("Officer Popielarz") was on patrol when he drove to the end of a dead-end street adjacent to which was a small apartment building.  Officer Popielarz knew this to be the residence of a known drug dealer named Scott Alvis.  On two separate occasions earlier that year, Officer Popielarz had served search warrants upon Scott Alvis at this apartment building.  Officer Popielarz observed a man in the parking lot of the residence with a bicycle.  Upon seeing the officer, the man proceeded around to the back of the building, still with the bicycle.  The officer could not identify the man other than to identify him as black.  Officer Popielarz then drove around and parked in a different parking lot so that he was behind the building.  At no time did Officer Popielarz activate his emergency lights or siren.

Officer Popielarz walked over to the man and asked, "How are you?"[2] At that point, and for the first time in this encounter, Officer Popielarz recognized the man as Higgs from a recent arrest for felony assault which had followed a disagreement about a drug deal. Officer Popielarz asked Higgs, "[d]o you remember me?" and Higgs

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] In conducting our review of the record, we note that our analysis was greatly benefited by the ability to watch and hear the entire encounter between Higgs and Officer Popielarz by way of Officer Popielarz's body worn camera, which was entered into evidence.  The facts surrounding this encounter are drawn largely from such evidence.

acknowledged that he did. Officer Popielarz asked Higgs what he was "doing rolling around over here," to which Higgs stated "just visiting," and then added that he had gone to the store for a friend named "Scott," and gestured to the building. Higgs was carrying several items from the store and began to drop item after item. Officer Popielarz believed nervousness caused Higgs to do so.

Officer Popielarz observed the bicycle parked upright in a clearing in the woods, noticeably away from the building. Officer Popielarz asked Higgs why he "went around here when you saw me." Higgs responded that he was "coming this way" before he had seen him. Officer Popielarz replied stating, "[c]ome on, [Higgs], be straight with me." Higgs stated that he was "being straight." Officer Popielarz reminded Higgs that "you ran from me last time, remember that? I'm the one that tackled you onto the ground at Flat Branch Park. That was me. Because you ran from me." Higgs again dropped items from his bag during which time the bicycle fell over. Officer Popielarz asked Higgs if the bicycle was his and Higgs said that it was. Officer Popielarz asked, "[h]ow long have you had that?" Higgs stated "[i]t's not mine. I'm just riding it." Officer Popielarz then asked Higgs if he "ha[d] anything illegal" on him. After a short pause and as he picked up his dropped items, Higgs stated "no" and began to walk away from Officer Popielarz, to which the officer asked, "[w]here are you going?" Higgs answered he was going to stand his bike back up, and Officer Popielarz responded, "[o]h, okay, go ahead." Officer Popielarz then approached the bicycle, shined his flashlight on it, and again asked, "[t]his is a nice bike. How long

3

have you had it?" Higgs again stated that it was not his and that he was "just riding it."

Upon Officer Popielarz taking this further interest in the bicycle, Higgs began to walk away again. Officer Popielarz told Higgs, "[d]on't go anywhere" and told Higgs to "sit down." Higgs repeatedly asked why and Officer Popielarz repeated his command to sit down. Higgs eventually complied. As Higgs sat on the concrete, Officer Popielarz told him that this was his "one warning," and "if you try to walk away from me again, I will throw you on the ground. You have my word. Do you understand me?"[3] Higgs acknowledged that he understood.

Because Higgs had begun to walk away after stating for the second time he was "just riding [the bike]", Officer Popielarz called for backup and another officer arrived shortly thereafter. Officer Popielarz then turned to Higgs and stated, "I'm investigating a couple things right now, [Higgs], okay? I needed him here (pointing to the approaching officer) so you don't run from me again." Officer Popielarz then turned his attention back to the bicycle.[4] The bicycle's serial number was radioed in by Officer Popielarz to see if it had been reported stolen. Dispatch reported the serial number was not on file.[5] Officer Popielarz also ran Higgs for any outstanding warrants; none were reported.

---

[3] During Officer Popielarz's prior arrest of Higgs for felony assault, Officer Popielarz was forced to tackle Higgs as he attempted to flee.

[4] As Officer Popielarz was inspecting the bicycle, he can be heard radioing dispatch that, "[h]e's detained."

[5] Officer Popielarz testified that it is not uncommon for stolen property to not be on file with law enforcement as stolen. This is especially true for bicycles, as people rarely know the serial number of their bicycle to report to law enforcement, and without a serial number a bicycle cannot be confirmed as stolen.

Officer Popielarz asked Higgs for permission to search him. Higgs provided a mumbled, unintelligible response, and Officer Popielarz asked, "[y]ou do mind?" Higgs then volunteered, "I have paraphernalia." When asked, Higgs clarified that he had drug paraphernalia on his person. Officer Popielarz told Higgs to stand up so that he could place him under arrest. As Higgs stood up, he began reaching into his right jacket pocket. Officer Popielarz grabbed his arms and placed them behind his back. As Officer Popielarz reached for handcuffs, Higgs again attempted to move his arms back in front of him. Officer Popielarz warned Higgs that he would take him to the ground if he did so again. While attempting to handcuff Higgs, Higgs again moved his arms in front of him, and Officer Popielarz pushed him to the ground. Higgs landed with his hands beneath him and was still trying to reach into his right jacket pocket. Officer Popielarz demanded him to stop resisting and in the midst of the struggle unsheathed his taser, which Higgs quickly grabbed and pulled out of Officer Popielarz's grip. Officer Popielarz was able to recover the taser, and in the struggle the taser deployed and struck Higgs. Officer Popielarz was thereafter able to secure Higgs in handcuffs.

A search of Higgs subsequent to arrest revealed a 9mm handgun in his right jacket pocket. The handgun was loaded with a round in the chamber. Several more bullets were discovered in Higgs's pocket. Two pipes used for ingesting illicit drugs were found in Higgs's *left* jacket pocket and pant pockets. The entire encounter between Officer Popielarz and Higgs, from initial backyard interaction to finally being handcuffed, lasted approximately nine minutes.

Higgs was charged as a prior and persistent offender with the felonies of unlawful possession of a firearm and attempting to disarm a peace officer, and with the misdemeanors of resisting a lawful detention and possession of drug paraphernalia. In exchange for Higgs waiving a jury trial, the State dismissed all counts except unlawful possession of a firearm.

On September 21, 2020, Higgs filed a motion to suppress evidence and statements, arguing that the evidence seized and statements given were the result of an unlawful search and seizure "in violation of [Higgs]'s rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments[.]" Following a suppression hearing, the trial court denied the motion.

On October 7, 2020, a bench trial was held. At trial, the State offered into evidence the firearm and ammunition found on Higgs, to which Higgs objected based on his motion. Higgs again objected by renewing his motion when Higgs's statements were offered. The trial court overruled Higgs's objections. Higgs was found guilty of felony unlawful possession of a firearm as a prior and persistent offender. The court sentenced Higgs to ten years in the custody of the Department of Corrections.

Higgs appeals. Further factual details will be provided as relevant in the analysis below.

**Standard of Review**

This Court's review of the circuit court's ruling is a two-part inquiry. "Th[is] Court defers to the trial court's determination of credibility and factual findings, inquiring only whether the decision is supported by substantial evidence, and it will

6

be reversed only if clearly erroneous." *State v. Hughes*, 563 S.W.3d 119, 123 (Mo. banc 2018) (quoting *State v. Carrawell*, 481 S.W.3d 833, 837 (Mo. banc 2016)). This Court considers both the evidence presented before the ruling on the motion to suppress and the evidence at trial to determine whether sufficient evidence exists in the record to support the circuit court's ruling. *Id.* (citing *State v. Pike*, 162 S.W.3d 464, 472 (Mo. banc 2005)).

"Clear-error review requires that the moving party properly preserved the trial court error below." *State v. Lewis*, 431 S.W.3d 7, 13 (Mo. App. E.D. 2014) (citing *State v. Nylon*, 311 S.W.3d 869, 884 (Mo. App. E.D. 2010)). "To properly preserve an objection for appeal, the moving party must make a specific objection at trial asserting the same grounds raised on appeal." *Id.* (citing *State v. Moore*, 303 S.W.3d 515, 522-23 (Mo. banc 2010)). As to Point I, "[i]f the moving party fails to properly object at trial, then the claimed errors may only be reviewed for plain error." *State v. Nylon*, 311 S.W.3d at 884. "This Court will only reverse under plain error review 'where the ruling of the trial court results in a miscarriage of justice or a manifest injustice.'" *Id.* (quoting *State v. Coyne*, 112 S.W.3d 439, 443 (Mo. App. E.D. 2003)); *see also* Rule 30.20.[6]

"Determinations of reasonable suspicion and probable cause are reviewed *de novo* on appeal." *State v. Hughes*, 563 S.W.3d at 124 (quoting *State v. Grayson*, 336 S.W.3d 138, 142 (Mo. banc 2011)). "This Court will 'indulge every reasonable presumption against waiver of fundamental constitutional rights." *State v. Rice*, 573

---

[6] All Rule references are to the Missouri Supreme Court Rules (2018), unless otherwise indicated.

7

S.W.3d 53, 66 (Mo. banc 2019) (quoting *State v. Bucklew*, 973 S.W.2d 83, 90 (Mo. banc 1998)).

**Analysis**

Higgs presents four points on appeal, all of which claim the trial court erred in overruling his motion to suppress and in admitting evidence over his objections. In his first point, Higgs argues that Officer Popielarz engaged in racial profiling in finding reasonable suspicion to stop him. Second, Higgs contends that based on the circumstances, Officer Popielarz did not have a reasonable suspicion to stop him. Third, Higgs argues he was seized from the outset of the encounter in that the initial encounter was not consensual. Finally, Higgs contends that he was subjected to custodial interrogation without having been given *Miranda* warnings, rendering his statement and the fruits of that statement inadmissible.

### *Point I*

In his first point on appeal, Higgs argues that the trial court erred in overruling his motion to suppress because Officer Popielarz racially profiled him in finding that a 52-year-old black man riding a "nice" new bicycle was a suspicious factor warranting a *Terry* stop. Preliminarily, we must address the State's contention that this claim was not preserved for appellate review. "Appellate courts are merely courts of review for trial errors, and there can be no review of a matter which has not been presented to or expressly decided by the trial court." *State v. Courtney*, 589 S.W.3d 49, 57 (Mo. App. E.D. 2019) (citation omitted).

Higgs's motion to suppress was denied at the pre-trial suppression hearing. In it, Higgs argued that police officers illegally detained and arrested him, seizing a firearm and drug paraphernalia that was found on his person. Higgs's motion concluded that the "evidence was seized in violation of defendant's rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution [and] Article I, Sections 10, 15, and 18(a) of the Missouri Constitution[.]" The motion was silent in regards to police engaging in racial profiling. Likewise, no evidence or argument regarding same was presented at the suppression hearing or at trial, and Higgs did not cross-examine either officer at the suppression hearing or at trial about racial profiling.

At trial, Higgs renewed his motion to suppress prior to the testimony of Officer Popielarz. No additional grounds for suppressing the evidence were given at that time. Near the end of the cross-examination of Officer Popielarz, the following occurred:

Q: And the bike was suspicious to you because it was in new, good condition; right?

A: And he had abandoned it behind an apartment building and was walking away from it.

Q: So the fact that the bike was new and in good condition was not suspicious to you?

A: That was a factor.

Q: So the fact that a 52-year-old black man had a nice bike was suspicious to you, right?

A: Not in and of itself.

9

Q: But it was a factor?

A: Yes.

Higgs made no further argument or objection to the admission of evidence on the theory of racial profiling. Despite Higgs's argument to the contrary, his claim that Officer Popielarz engaged in racial profiling is not preserved for appeal. Thus, we review for plain error under Rule 30.20.

> Rule 30.20 authorizes this Court to review, in its discretion, plain errors affecting substantial rights . . . when the court finds that manifest injustice or a miscarriage of justice has resulted therefrom. Our Supreme Court has established a threshold review to determine if a court should exercise its discretion to entertain a Rule 30.20 review of a claimed plain error. First, we determine whether or not the claimed error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted[.] If not, we should not exercise our discretion to conduct a Rule 30.20 plain error review. If, however, we conclude that we have passed this threshold, we may proceed to review the claim under a two-step process pursuant to Rule 30.20. In the first step, we decide whether plain error has, in fact, occurred. All prejudicial error, however, is not plain error, and plain errors are those which are evident, obvious, and clear. In the absence of evident, obvious, and clear error, we should not proceed further with our plain error review. If, however, we find plain error, we must continue to the second step to consider whether or not a miscarriage of justice or manifest injustice will occur if the error is left uncorrected.

*State v. Barlow*, 543 S.W.3d 102, 105 (Mo. App. W.D. 2018) (internal citations and quotations omitted).

On cross-examination at trial, Officer Popielarz testified the fact that Higgs was an older black man with a new bike was a factor, but that this factor was not independently suspicious to him. Although it is of concern that one of the factors noted by the officer was that a 52-year-old black man possessed a nice bicycle, we are constrained by precedent to look at whether an objectively reasonable person would

10

have probable cause to stop, not whether one of many subjective factors utilized by the officer is of concern. "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996). "[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent." *Id.* at 814 (emphasis in original) (*see also State v. Lane*, 937 S.W.2d 721, 723 (Mo. banc 1997)) ("Constitutionally sound probable cause is not dependent upon the subjective intentions of the officer.")    Here, even though Officer Popielarz admitted that race was a subjective factor, by the time Higgs was actually detained the officer was aware of multiple circumstances which established an objectively reasonable suspicion. These factors are discussed more fully in connection with Points II and III. They include: Higgs first observing a police cruiser and then going behind the apartment building where a known drug dealer resides; the officer identifying Higgs and knowing his prior criminal activity included drug activity; the officer observing the bike had been parked among trees and not close to the building, as if to separate Higgs from it; and Higgs's inconsistent statements concerning his ownership of the bike, and concerning the reasons for his visit to the building. Though *Whren* holds that "the Constitution prohibits selective enforcement of the law based on considerations of race," 517 U.S. at 813, Officer Popielarz's subjective consideration of race does not override the fact that his *Terry* stop of Higgs was otherwise objectively reasonable.    We find no error – plain or otherwise – has occurred.  Point I is denied.

***Points II and III***

In Point II, Higgs claims the trial court clearly erred in overruling his motion to suppress, as renewed during trial by objection, because Officer Popielarz did not have reasonable suspicion to stop him. In Point III, Higgs claims the trial court clearly erred in overruling his motion to suppress, as renewed during trial by objection, because Officer Popielarz's encounter with him was a detention from its inception due to Officer Popielarz's "coercive accusatory questioning." As a result, Higgs claims his paraphernalia statements, the gun, and the ammunition were inadmissible.[7]

The Fourth Amendment of the United States Constitution guarantees the right to be free from unreasonable searches and seizures. "Article I, section 15 of the Missouri Constitution affords the same protection and has been deemed to be coextensive with the Fourth Amendment." *State v. Hawkins*, 137 S.W.3d 549, 557 (Mo. App. W.D. 2004) (citing *State v. Rushing*, 935 S.W.2d 30, 34 (Mo. banc 1996)). "Decisions of the United States Supreme Court construing the Fourth Amendment are 'strongly persuasive' in construing article I, section 15 of the Missouri Constitution." *Id.*

Under *Terry v. Ohio*, 392 U.S. 1, 20 (1968), law enforcement may make an investigatory stop if they are able to point to "'specific and articulable facts' that, taken together with rational inferences from those facts and the officer's own

---

[7] In his brief, Higgs offers statistical evidence and factual conclusions from social science to explain his activity. However, Higgs did not present any of this evidence at the suppression hearing or at trial. "On appeal, we consider only the record made before the trial court, and we cannot consider evidence extraneous to the record." *St. Louis Cty. v. Shanklin*, 616 S.W.3d 423, 429 (Mo. App. E.D. 2020).

knowledge and experience, support a 'reasonable suspicion' that illegal activity has occurred or is occurring." *State v. Johnson,* 599 S.W.3d 196, 203 (Mo. App. W.D. 2020) (quoting *State v. Smith*, 448 S.W.3d 835, 840 (Mo. App. S.D. 2014)).

> The existence of reasonable suspicion is determined objectively by asking whether the facts available to the officer at the moment of the seizure warrant a person of reasonable caution in the belief that the action taken was appropriate. While this standard does not rise to that of the traditionally required probable cause, a proper *Terry* stop must be supported by some minimal level of objective justification. The [reasonable suspicion] that will justify the minimally intrusive *Terry* stop is present when a police officer observes *unusual conduct* which leads him reasonably to conclude *in light of his experience* that criminal activity may be afoot. Furthermore, while displays of nervousness are to be considered as a contributing factor, a court must examine the totality of the circumstances in order to evaluate whether the standard for reasonable suspicion has been met.

*State v. Waldrup*, 331 S.W.3d 668, 673 (Mo. banc 2011) (internal citation and quotation marks omitted) (emphasis in original).

"Generally, 'warrantless seizures are unreasonable and, thus, unconstitutional.'" *State v. Waldrup*, 331 S.W.3d at 672 (quoting *State v. Pike*, 162 S.W.3d at 472). However, "[t]he United States Supreme Court has made clear that, for purposes of the Fourth Amendment, a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *State v. Marr*, 499 S.W.3d 367, 373 (Mo. App. W.D. 2016) (quoting *State v. Lammers*, 479 S.W.3d 624, 631 (Mo. banc 2016)). Rather, a "'seizure' occurs '[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" *State v. Perry*, 548 S.W.3d 292, 298 (Mo. banc 2018) (quoting *Terry v. Ohio*, 392 U.S. at 19). Thus, "[s]o long as a reasonable person would feel free 'to disregard

the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." *State v. Marr*, 499 S.W.3d at 373 (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). "[T]he test for [the] existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *State v. Perry*, 548 S.W.3d at 298 (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). Moreover, "'where [physical force] is absent, submission to the assertion of authority' is also required to effect a seizure." *Id.*

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*Id.* (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

Thus, the question as to when the seizure occurred is whether Officer Popielarz's conduct would cause a reasonable person in Higgs's position to believe he was not free to leave. To answer that question, "a court must consider the totality of the circumstances surrounding the encounter by engaging in a 'careful, conscientious appraisal . . . of all the evidence that bears' on the claim." *State v. Sund*, 215 S.W.3d 719, 724 (Mo. banc 2007) (quoting *State v. Hester*, 425 S.W.2d 110, 114 (Mo. 1968)) (internal citation omitted).

The trial court made the following findings of fact relevant to its determination of reasonable suspicion and when the seizure occurred:

Officer Joshua Popielarz testified that on December 31, 2019, at approximately 6:00 pm, he was on patrol on Richardson Street in Columbia, Missouri. While on patrol, Officer Popielarz observed a man with a bicycle outside of 1612 Richardson Street in the parking lot. This address was known to Officer Popielarz as being the residence of a drug dealer named Scott Alvis. Officer Popielarz testified that he had personally assisted with the execution to two narcotics related search warrants at that residence.

Officer Popielarz testified that when the individual with the bicycle saw the officer's patrol car, the individual began walking away from the patrol car and towards the rear of the residence. Officer Popielarz thought that was strange, since there is only a wooded area with a small clearing behind the address.

Officer Popielarz drove around to the other side of the residence and exited his patrol vehicle. His emergency lights were not activated. As he approached the same individual he had just seen in the front of the residence, he observed the bicycle he had been pushing was parked on the kick stand out in the clearing in the woods, away from the residence. Officer Popielarz thought that was strange, since, based on his experience, most bicycle owners tend to secure their bicycles in or near their residence or destination.

Upon approaching the individual, Officer Popielarz immediately recognized him as Defendant. Officer Popielarz had prior law enforcement contacts with Defendant. One prior contact included arresting Defendant after Defendant committed a felony assault that originated with a dispute over narcotics. While attempting to arrest Defendant for that felony assault, Defendant fled from Officer Popielarz, making it necessary for Officer Popielarz to pursue and tackle Defendant to the ground to effectuate the arrest.

The initial interactions between Officer Popielarz and Defendant on December 31, 2019, were cordial. Officer Popielarz asked Defendant how he was and if he was doing okay. Eventually, Officer Popielarz asked Defendant why he was behind 1612 Richardson Street in a clearing in the woods. Defendant first replied that he was just visiting, then stated that he went to the store for a friend. When asked who the friend was, Defendant replied that his friend's name was "Scott", and gestured towards 1612 Richardson Street. Officer Popielarz asked Defendant why he came to the back of the residence when he observed the officer's patrol car, and Defendant replied that he was already going that way. Officer Popielarz further observed that Defendant had parked

15

in [sic] bicycle on its kick stand in the clearing in the woods, away from the residence. When asked about the bicycle, Defendant first told Officer Popielarz that it was his bicycle, but then changed his story and told Officer Popielarz that he was only riding it. Defendant then, around three minutes and twenty-one seconds into the video captured by Officer Popielarz's body worn camera, Defendant attempted to walk away from the bicycle and Officer Popielarz. At that point, Officer Popielarz told Defendant "Don't go anywhere." When Officer Popielarz' backup officer arrived, Officer Popielarz told Defendant that he was investigating "a couple of things." Officer Popielarz testified that he was investigating whether the bicycle was stolen and whether there was narcotics activity afoot. Officer Popielarz checked with the Columbia Police Department to see if the bicycle was on file as stolen. The bicycle was not on file as stolen. Officer Popielarz then asked Defendant if he would consent to a search of his person. In response, Defendant told Officer Popielarz that he had drug paraphernalia on his person. Officer Popielarz and his backup officer, Officer Jacob Waldrup, then effectuated the arrest of Defendant. Incident to that arrest, Officer Waldrup located a firearm with a live round in the chamber in Defendant's right jacket pocket, and a pipe used for the smoking of illegal narcotics in Defendant's left pants pocket.

The trial court made the following conclusions of law:

As set forth in the Findings of Fact above, Officer Popielarz had ample articulable facts that would lead him to believe that criminal activity was afoot. Officer Popielarz therefore had reasonable suspicion to detain Defendant. The Court further finds that Defendant was not seized for the purposes of the Fourth Amendment until approximately three minutes and twenty-one seconds into the video captured by Officer Popielarz's body worn camera at the point in which Officer Popielarz told Defendant "Don't go anywhere." Before that point, contact with Officer Popielarz was consensual.

Based on our review of the record, the trial court did not clearly err in finding that Officer Popielarz had reasonable suspicion to detain Higgs when he told Higgs "[d]on't go anywhere," and Higgs was not detained prior to that time.[8]

---

[8] It may be arguable that Higgs was subject to detention a moment earlier, when Officer Popielarz asked Higgs where he was going, and then assented to Higgs stepping away to stand his bicycle back up. We need not resolve that question, since Officer Popielarz was in possession of all of the information establishing reasonable suspicion for the detention before that earlier exchange (even

16

It is clear that Higgs was seized for Fourth Amendment purposes when Officer Popielarz told Higgs "[d]on't go anywhere" and commanded him to "sit down." Initially, however, we review the facts available to Officer Popielarz to commence and continue a *Terry* stop prior to this seizure. First, Higgs was on a dead-end street in the parking lot of a small apartment complex where Scott Alvis, a known drug dealer, resided. While Higgs's presence in a neighborhood where drug transactions were known to take place is not, on its own, a sufficient basis for concluding that Higgs was engaged in criminal activity, *Brown v. Texas*, 443 U.S. 47, 52 (1979), "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *State v. Hawkins*, 137 S.W.3d at 558 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). Thus, Higgs's presence outside a known drug dealer's residence is among the relevant contextual considerations in a *Terry* analysis. Higgs later admitted to associating with Scott Alvis, thereby strengthening the inference drawn from Higgs's presence.

Second, when Higgs initially noticed Officer Popielarz, Higgs walked behind the building. An attempt to evade law enforcement can be evidence of concealing illegal activity and, thus, supports a finding of reasonable suspicion. *State v. Galen*, 554 S.W.3d 550, 554-55 (Mo. App. E.D. 2018) (citing *U.S. v. Sharpe*, 470 U.S. 675, 682 n.3 (1985)). That Higgs went behind a known drug dealer's building upon seeing the officer creates additional contextual reasonable suspicion.

---

though Higgs thereafter stated for the second time that he was "just riding" the bicycle, but did not own it).

17

Third, and continuing to heighten the officer's reasonable suspicion, Higgs parked the bicycle in a clearing in the woods, away from himself and the residence, after initially seeing Officer Popielarz. The officer found this strange because, based on his experience, most bicycle owners tend to secure their bicycles in or very near their residence or destination. Officer Popielarz testified as to his belief that Higgs was separating himself from the bicycle and "wanted nothing to do with it because I was there," which could reasonably be inferred as behavior consistent with theft. Higgs's conduct was particularly suspicious in light of being in a college town and his proximity to multiple college campuses where a substantial number of bicycles were present, and even more suspicious given that college was not in session, meaning most bicycles were left unattended. Generally, "a permissible inference of guilt may be drawn from acts or conduct of an accused subsequent to an offense if they tend to show a consciousness of guilt by reason of a desire to conceal the offense or accused's role therein." *State v. Hibbert*, 14 S.W.3d 249, 253 (Mo. App. S.D. 2000).

Fourth, upon approaching Higgs, Officer Popielarz was able to identify Higgs based on a previous encounter where he arrested Higgs for felony assault involving a suspected drug transaction. Officer Popielarz testified that at the time of the prior arrest, Higgs informed him that the "whole altercation was because two people were mad at him because he would not sell them drugs," and that Higgs quickly corrected himself, stating to Officer Popielarz, "I don't have any. I don't sell drugs." "[W]hile criminal history 'cannot form the sole basis to determine reasonable suspicion . . .,' it can certainly be one of the factors in a criminal activity analysis." *State v. Smith*, 373

18

S.W.3d 502, 506 (Mo. App. S.D. 2012) (quoting *State v. Grayson*, 336 S.W.3d at 146). As well, "[k]nowledge of 'recent relevant criminal conduct, is a permissible component of the articulable suspicion required for a *Terry* stop." *State v. Hawkins*, 137 S.W.3d at 558 (quoting *United States v. Feliciano*, 45 F.3d 1070, 1074 (7th Cir. 1995)). Officer Popielarz's knowledge of Higgs's prior criminal activity, which included drug activity, is a permissible factor to consider in determining whether reasonable suspicion existed. The reasonable suspicion is further compounded because Higgs, someone known to be involved with drugs, was at the building where a known drug dealer resided.

Fifth, during the initial encounter with Officer Popielarz, Higgs demonstrated significant nervousness which appeared to cause Higgs to fumble items he had purchased at the store. "While nervousness alone is insufficient to establish reasonable suspicion, 'it can be considered as one factor in the totality of the circumstances.'" *State v. Smith*, 373 S.W.3d at 506 (quoting *State v. Bizovi*, 129 S.W.3d 429, 432 (Mo. App. E.D. 2004)).

Finally, prior to the seizure, Higgs made several false or contradictory statements. In regard to the bicycle, Higgs first told Officer Popielarz that it was his. Moments later, when asked how long he had owned it, Higgs stated, "[i]t's not mine. I'm just riding it." This conversation played out not once, but twice. We agree with the trial court, which noted that Higgs's changing stories supported a finding of reasonable suspicion. Additionally, Higgs told Officer Popielarz that he was "just visiting," but then said that he had gone to the store for his friend Scott. "False

statements to police can give rise to an inference of guilty behavior." *State v. Smith*, 11 S.W.3d 733, 737 (Mo. App. E.D. 1999) (citing *State v. Allen*, 817 S.W.2d 526, 528 (Mo. App. E.D. 1991)).

In their totality, the circumstances known to Officer Popielarz at the time Higgs was stopped establish a reasonable suspicion that criminal activity was afoot, and the officer's reasonable suspicion was justifiably heightened throughout the stop. Nevertheless, Higgs discounts each of these circumstances, arguing that each factor, on its own, did not provide Officer Popielarz reasonable suspicion. "Rather than look at each circumstance individually, however, reviewing courts must consider the totality of the circumstances to determine whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *State v. Hawkins*, 137 S.W.3d at 558 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)) (internal quotation marks omitted). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* "What might be considered 'unremarkable' behavior in one particular location and context may be deemed 'quite unusual' in another." *Id.* (quoting *United States v. Arvizu*, 534 U.S. at 276). "To the extent that a totality of the circumstances approach may render appellate review less circumscribed by precedent than otherwise, it is the nature of the totality rule." *Id.*

That these circumstances, individually, may not be proof of any illegal conduct and are consistent with innocent behavior does not establish a violation of the Fourth

Amendment. *Illinois v. Wardlow*, 528 U.S. at 125. Indeed, the United States Supreme Court noted in *Wardlow*, "[e]ven in *Terry*, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation." *Id*. "*Terry*, however, permits officers to detain persons 'to resolve the ambiguity.'" *State v. Hawkins*, 137 S.W.3d at 559 (quoting *Illinois v. Wardlow*, 528 U.S. at 125). "The Court acknowledged that 'in allowing such detentions, *Terry* accepts the risk that officers may stop innocent people.'" *Id*. (quoting *Illinois v. Wardlow*, 528 U.S. at 126). "Such a risk is justifiable, however, because a *Terry* stop is a 'minimal intrusion, simply allowing the officer to briefly investigate further. If the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way.'" *Id*. Notably, the duration of this *Terry* stop, from the initial backyard encounter to the time Higgs was seized, was less than three minutes in duration; a brief encounter indeed. *See State v. Stover*, 388 S.W.3d 138, 151 (Mo. banc 2012). Here, the totality of the circumstances establish that Officer Popielarz possessed a reasonable suspicion to *Terry* stop Higgs.

Neither does the record support Higgs's Point III claim that he was seized from the inception of his encounter with Officer Popielarz, but rather it supports the trial court's finding that Higgs was not detained by Officer Popielarz until he instructed Higgs, "[d]on't go anywhere."

We first note that neither Officer Popielarz's actions, words, nor the tone in which he spoke to Higgs could be objectively understood as an order to restrict movement. In fact, the record supports the trial court's finding that the interaction

21

between Officer Popielarz and Higgs was remarkably "cordial" until Higgs was actually seized by the officer. Officer Popielarz testified at trial that, prior to exiting his patrol vehicle to go speak with Higgs, he did not activate his sirens or lights.[9] When he first approached Higgs and recognized him, he asked, "How are you doing, Thomas [Higgs]?" Higgs replied, "I'm good." He asked Higgs if he remembered him, and Higgs acknowledged that he did. He then asked Higgs, "[w]hat are you doing rolling around over here?" Higgs stated that he was "[j]ust visiting" and that he "went to the store for a friend." Officer Popielarz asked Higgs who his friend was, and Higgs eventually replied, "Scott [Alvis]." Officer Popielarz asked Higgs, "[s]o why did you come all the way around back when you saw me?" Higgs replied that he "was just coming this way." Officer Popielarz told Higgs to "be straight" and Higgs said that he was "being straight." Officer Popielarz reminded Higgs that "you ran from me last time, remember that? I'm the one that tackled you onto the ground at Flat Branch Park. That was me. Because you ran from me."

Higgs then began walking away *on his own accord*, and Officer Popielarz asked where he was going. Higgs replied, "I was getting my bike," to which Officer Popielarz responded, "[o]h okay, go ahead." Notably, that Higgs began walking away on his own accord demonstrates the lack of show of authority by Officer Popielarz as well as Higgs's lack of submission to that authority, and further establishes that Higgs felt

---

[9] Notably, Missouri courts have cited the absence of emergency lights when finding that there was not a show of authority from police. *See State v. Perry*, 548 S.W.3d 292, 299 (Mo. banc 2018); *State v. Carr*, 441 S.W.3d 166, 170 (Mo. App. W.D. 2014). In specifically discussing the absence of lights, the holdings in *Perry* and *Carr* strongly suggest that the presence of emergency lights in pedestrian encounters would be a show of authority effectuating a seizure.

22

free "to disregard the police and go about his business." *See State v. Perry*, 548 S.W.3d at 298; *see also Brendlin v. California*, 551 U.S. 249, 254 (2007) ("A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission.").

Officer Popielarz approached the bicycle and asked Higgs, "[t]his is a nice bike. How long have you had it?" Higgs replied, "[i]t's not mine. I'm just riding it." This statement led the officer to further investigate the situation and seize Higgs, as it was a contradiction in Higgs's story that the bicycle was "mine." It was not until Higgs began to walk away for the second time that Officer Popielarz instructed Higgs to not go anywhere and to sit down. Higgs complied to this show of authority. We agree with the trial court's finding that only at this moment did Officer Popielarz effectuate a seizure upon Higgs.

Our finding that the encounter was consensual from the outset and until Officer Popielarz possessed a reasonable suspicion to briefly seize Higgs is furthered by the absence of multiple police officers,[10] no display of a weapon, no physical touching of Higgs by Officer Popielarz, and the cordial and professional nature in which Officer Popielarz interacted with Higgs.

We find that a reasonable person in Higgs's position would perceive that they were free to disregard the officer's requests and, thus, were free to leave until the officer directed Higgs to sit down. Therefore, we hold that the initial encounter between Officer Popielarz and Higgs was consensual and did not constitute a seizure.

---

[10] The additional officer, Officer Waldrup, arrived *after* Officer Popielarz had seized Higgs by instructing him to not go anywhere and to "sit down."

23

The trial court did not clearly err in overruling Higgs's motion to suppress. Points II and III are denied.

***Point IV***

In his fourth point on appeal, Higgs contends the trial court clearly erred in overruling his motion to suppress his statement concerning possessing paraphernalia, and the resulting seizure of his gun and seized ammunition because when he made such statement he was subjected to custodial interrogation without having been provided *Miranda* warnings, rendering inadmissible his statement as well as the physical evidence resulting therefrom. We disagree.

"*Miranda* rights inform a criminal defendant of his constitutional rights during the interrogation process." *State v. Holman*, 502 S.W.3d 621, 624 (Mo. banc 2016) (quoting *State v. Collings*, 450 S.W.3d 741, 753 (Mo. banc 2014)). "[A]lthough *Miranda* warnings must precede 'custodial interrogation,' a request for consent to search is not an 'interrogation' because giving consent to search is not a self-incriminating statement under the Fifth Amendment." *Id.* (quoting *State v. Metz*, 43 S.W.3d 374, 382 (Mo. App. W.D. 2001); *see also State v. Baldwin*, 290 S.W.3d 139, 144 (Mo. App. W.D. 2009); *United States v. Payne*, 119 F.3d 637, 643-44 (8th Cir. 1997) ("*Miranda* rights affect the integrity of the truth finding process in a criminal trial, but Fourth Amendment rights go to the right of privacy and to be left alone. As the purposes of the two protections are different, it would be unreasonable to require *Miranda* warnings before a request for permission to search.").

24

Here, Officer Popielarz asked Higgs for permission to search his person. This request by the officer did not constitute an interrogation. The request was simply a 'yes' or 'no' proposition, and neither consenting to, nor denying, the request to search would have been a self-incriminating response. Consequently, Officer Popielarz's question did not invoke the Fifth Amendment's right not to testify against oneself and no *Miranda* warning was required. *State v. Holman,* 502 S.W.3d at 624.

Then, rather than provide a 'yes' or 'no' answer to Officer Popielarz's request for consent to search, Higgs made the non-responsive, voluntary statement, "I have paraphernalia." Such "[v]oluntary statements are not the product of interrogation and thus not barred by the Fifth Amendment or *Miranda.*" *State v. Craig*, 550 S.W.3d 481, 484 (Mo. App. W.D. 2018); *Baumruk v. State*, 364 S.W.3d 518, 532 (Mo. banc 2012); *Gregg v. State*, 446 S.W.2d 630, 632 (Mo. 1969) ("[V]olunteered statements *of any kind* are not barred by the Fifth Amendment[.]") (quoting *Miranda v. Arizona*, 384 U.S. 436, 478 (1966)) (emphasis added). Here, Higgs's statement, "I have paraphernalia," was not the product of custodial interrogation and did not implicate Fifth Amendment or *Miranda* protections against self-incrimination. Rather, it was voluntarily made by Higgs in response to a request for consent to search, *which itself* did not constitute an interrogation. Neither Officer Popielarz's request to search Higgs nor Higgs's volunteered response regarding his possession of paraphernalia implicated Fifth Amendment rights against self-incrimination and the need for a *Miranda* warning.

25

Next, we turn to the admissibility of the firearm and ammunition. "A warrantless search is "*per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Greene v. State*, 585 S.W.3d 800, 804 (Mo. banc 2019) (quoting *Arizona v. Gant,* 556 U.S. 332, 338 (2009)). A search incident to arrest is one of these exceptions. *State v. Carrawell*, 481 S.W.3d at 838. A search incident to arrest allows officers "to remove any weapons that the [arrestee] might seek to use in order to resist arrest . . . and to seize any evidence on the arrestee's person in order to prevent its concealment or destruction." *Greene v. State,* 585 S.W.3d at 807 (quoting *Riley v. California*, 573 U.S. 373, 383 (2014)).

Here, upon Higgs's voluntary statement admitting to the possession of paraphernalia, probable cause was established for the arrest of Higgs, and Officer Popielarz arrested him. Officer Popielarz then attempted to handcuff Higgs, who repeatedly tried to reach into his right jacket pocket despite the officer's instructions not to do so. Upon securing control of Higgs, Officer Popielarz performed a search incident to arrest, as allowed to ensure officer safety and to prevent the destruction of evidence. *See id.* In doing so, he did, indeed, locate a loaded weapon and ammunition in Higgs's right jacket pocket*,* the very pocket into which Higgs repeatedly attempted to put his hand. The search was proper.

The admission of said evidence at trial did not violate Higgs's Fifth Amendment rights. The trial court did not clearly err in denying Higgs's motion to suppress and admitting at trial his voluntary statement, the firearm, and the ammunition lawfully discovered. Point IV is denied.

## Conclusion

The judgment of the trial court is affirmed.

_____
W. DOUGLAS THOMSON, JUDGE

All concur.